(No. 75687.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. FRANK BOUNDS, Appellant.

*Opinion filed December 21, 1995.—Rehearing denied
April 1, 1996.*

4

[Page redacted]

HARRISON, J., took no part.

Rita A. Fry, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Sally L. Dilgart and James P. Navarre, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Frank Bounds, was convicted of murder, aggravated criminal sexual assault, and aggravated kidnapping. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant's execution has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we affirm the judgment of the circuit court.

### I. Facts

The charges against the defendant arose from the sexual assault and murder of Carolyn Lewis. The victim was abducted on the morning of December 9, 1986, while she was walking to catch a bus that would take her to work. The victim was then taken to a nearby building, where she was sexually assaulted and later murdered.

Carolyn's mother, Tommie Lewis, testified at the defendant's trial that her daughter had worked for the Internal Revenue Service in downtown Chicago for 13 years. According to Mrs. Lewis, Carolyn would leave for

work between 6 and 6:30 each morning and walk to a nearby bus stop. Mrs. Lewis stated that Carolyn left for work at her usual time on December 9, 1986. Around 9 o'clock that morning, Mrs. Lewis received a call from one of Carolyn's coworkers, who said that Carolyn had failed to arrive for work. Later that day, Mrs. Lewis called the police to report that her daughter was missing. At trial, Mrs. Lewis identified, as belonging to her daughter, several items that were found in the building where Carolyn's body was later discovered. Mrs. Lewis stated that the shirt that Carolyn was wearing at the time her body was found did not belong to her daughter.

Delores Dennis, a resident of the neighborhood where these offenses occurred, testified that she heard a woman scream around 6 or 6:15 on the morning of Carolyn's disappearance. Dennis looked out her window but did not see anything suspicious. Dennis lived near the intersection of 74th and Princeton Streets.

The victim's body was discovered on December 13, 1986, in the second-floor apartment of a two-story frame house located at 7347 South Princeton Street, in Chicago. The victim was wearing only a T-shirt and was lying on a mattress on the floor in one of the rooms. The body was frozen, and an electrical extension cord was wrapped around the victim's neck.

Investigators found in another room a bed with sheets and covers; electrical space heaters stood on both sides of the bed. The room was also furnished with a television set and a dresser. There were liquor bottles, orange juice bottles, clothing, and boots in the room. Investigators discovered a purse containing the victim's identification. A broom stick was broken in two pieces, and one end of one piece was smeared with what appeared to be fecal matter. The toilet bowl in the bathroom was frozen, and there was no heat in the apartment. Investigators found food on the kitchen table

and in the cabinets. The apartment on the first floor of the building appeared to be vacant.

Investigators spoke with some of the members of the family that owned the building where the victim was found, and a warrant for the defendant's arrest was issued on December 15, 1986. The defendant was placed on the police department's "10 most wanted" list, and his photograph was provided to the news media. Investigators would occasionally receive reports that the defendant had been seen, but none of those tips led to his arrest.

Police investigators collected from the crime scene a number of objects that bore fingerprint ridges, including orange soda cans, a glass orange juice bottle, a vodka bottle, wine bottles, and a glass candy jar. The impressions on these objects were later examined, and 16 of them were found to match the defendant's fingerprints.

Dr. Robert Stein, the chief medical examiner of Cook County, performed an autopsy on the victim on December 15, 1986. An external examination of the victim revealed an electrical cord ligature around her neck; abrasions or contusions were also present around the neck, arms, right buttock, and right and left lower extremities. Dr. Stein stated that curvilinear abrasions around the victim's neck were probably produced by the victim as she tried to relieve the pressure of the ligature. An internal examination revealed a fracture to the victim's neck bone and areas of hemorrhage to the victim's neck muscles. Dr. Stein found no injuries to the victim's anus or vagina, although he explained that the absence of injuries was not inconsistent with sexual assault. A toxilogical report showed a blood-alcohol level of 0.205. Dr. Stein said that the elevated reading could be attributed partly, but not wholly, to alcohol produced by bodily decomposition.

On cross-examination, Dr. Stein stated that he did

not find any marks or other signs that would indicate that the victim's wrists or ankles had been bound. He was not able to determine the time of death, though he said the victim could have died three or four days before her body was discovered, on December 13. Dr. Stein was not able to determine whether the victim was killed where she was found.

The defendant was arrested for these offenses on October 6, 1987. Robert Easley, a private security guard, was working that day at the Daley Center at a display of old Chicago Transit Authority buses. According to Easley, around 1 o'clock in the afternoon he saw the defendant, whom he knew from the defendant's former employment with Easley's girlfriend. The defendant was handing out leaflets and was standing next to a sign that said, "Down with Death in the Streets." Easley was aware that the police were looking for the defendant, so Easley flagged down a passing patrol car.

Sergeant Leo Crotty, the officer whom Easley stopped, called for the assistance of a tactical unit. Three officers in plain clothes soon arrived. The officers received a description from Easley and later saw the defendant get off one of the buses that was on display. The officers then approached the defendant and asked him for identification. The defendant said that he did not have any with him, but said that his name was Michael Jones and gave an address on the north side. In response to a question from the officers, the defendant said that he was not familiar with the name Frank Bounds. The defendant agreed to accompany the officers to a police car so that they could make a further investigation. While the officers were checking the name the defendant had provided, they asked Easley to come to the car to attempt to identify the defendant. Easley did so, said the person was Frank Bounds, and leaned into the car and said, "Hi, Frank." According to Easley, the defen-

dant then bolted from the vehicle. Sergeant Crotty was able to catch the defendant.

That evening, the defendant gave an oral statement to Casimir Bartnik, an assistant State's Attorney. Bartnik prepared a written summary of the statement, which the defendant then reviewed and signed. At the defendant's trial, Bartnik read the summary of the statement to the jury. In the statement, the defendant said that he did not previously know the victim and that he first saw her on the morning of December 9, 1986, around 6:30, as she was walking on a sidewalk on Princeton Street. At the corner of 74th Street, the defendant grabbed the victim, placing his hand on her mouth. The victim bit his hand and screamed. The defendant then dragged the victim to an abandoned house owned by his family at 7347 South Princeton Street. The defendant took the victim to the second floor, where he had been living since he had been kicked out of his mother's house.

The defendant said that he then removed the victim's clothing, threw her on a bed in the main bedroom, and had vaginal intercourse with her at least once. The defendant stated that he might have had sex again later in the day and explained that he had been highly intoxicated on December 9 and was unable to remember all the details of the crimes. The defendant later tied the victim's hands and feet with an extension cord and stuffed a towel in her mouth. The defendant left the apartment at least twice that day, to buy liquor and food.

The next morning, December 10, the defendant ran out of money, and he found about thirty to forty dollars in the victim's purse. The defendant said that he panicked when he saw the victim's identification, which showed that she worked for the Internal Revenue Service. The defendant next went to a liquor store and then

returned to the apartment, where he sat drinking for several hours. The defendant said that the victim was calm and had a piercing stare, and he knew that she would remember his appearance. The defendant believed that he could not release the victim and decided to kill her instead.

The defendant wrapped an extension cord around the victim's neck and pulled on the ends of the cord until the victim stopped moving. The defendant said that this took about four to five minutes. The defendant then left the apartment, but he was unable to remember where he went. The defendant returned to the vicinity the next day around 4 p.m. but left when he saw police cars and police officers in the area. During this time the defendant remembered hearing and reading missing persons reports about the victim.

The defendant said that he realized that he would need help in disposing of the victim's body, so he called one of his brothers, Willie Amos, probably on December 10. On December 12, the defendant, Willie, and another brother, Raymond, drove to the building in Raymond's car. The defendant and Willie went upstairs, and Willie put his hand over his mouth and looked sick when he saw the victim's body. The defendant then told Willie to leave. Ray then drove the defendant to 79th Street and Halsted.

At the conclusion of the statement, the defendant said that he had not been promised or threatened in any way. Asked why he committed the crimes, the defendant said that he was angry at his stepfather and family for throwing him out of the family house. The defendant said that he wanted to get even and that Lewis seemed to be an easy victim.

At trial, the State also presented the testimony of Renolde Cannon, who was married to the defendant's mother at the time of the offenses involved here. Can-

non stated that the defendant was living with him and the defendant's mother, Castella Cannon, in the fall of 1986. According to Cannon, he and the defendant got into an argument the weekend after Thanksgiving about a space heater that the defendant was using in his bedroom. On Sunday, December 7, Cannon told the defendant to move out.

The defendant presented the testimony of several witnesses. Susan Mitchnick, the defendant's girlfriend, testified that she met the defendant in December 1986 at a meeting of the Homeless Union. They developed a relationship, and in March 1987 they began living together. Mitchnick said that during the afternoon of October 6, 1987, an officer from the Homeless Union called to tell her that the defendant had been arrested. Mitchnick later learned that the defendant was being held at Area 3 headquarters. She called there and left a message for the defendant. That evening, two police officers arrived at her home and spoke with her about the defendant. They asked her if she knew about the murder in December 1986, and she told them that she did not. According to Mitchnick, one of the officers stated that the case would receive widespread coverage in the news media and that the police could portray Mitchnick unfavorably. The officers then left. The defendant did not return Mitchnick's call until the next evening, October 7, when she told the defendant what the police had threatened to do.

On cross-examination, Mitchnick said that the officers did not ask her where she worked and that she did not tell them; Mitchnick testified that she was working for a small public relations and consulting firm. Mitchnick also listed the different residences where she lived during the year of her relationship with the defendant. In December 1986 she lived at 3165 West Palmer. She moved to 2147 West Charleston in March 1987, with the

defendant, and then in June 1987 she and the defendant moved to 3248 West Beach.

Willie Amos, Sr., who had previously been married to the defendant's mother, also testified in the defendant's behalf at trial. Amos stated that he owned the building located at 7347 South Princeton, where the victim's body was discovered. According to Amos, the family lived there until 1975, when they moved out and it was rented to others. In 1985 one of his sons, Willie Jr., moved into the second-floor apartment, where he lived for about six months. When Willie moved out, he left many of his belongings behind, including clothing and furniture. No one else occupied the apartment after that, according to the witness. He also stated that the building did not have gas, electrical, or water service.

Moses Cheeks, a city building inspector, also testified in the defendant's behalf at trial. Cheeks had inspected the building located at 7347 South Princeton on December 15, 1986, following the discovery of the victim's body there. Cheeks said that someone had apparently been living there, for he found clothing and furniture in both units. According to Cheeks, there was no heat, and the electricity and water had been turned off.

The defendant's final witness was Lance Lee, who lived at 7345 South Princeton, next door to the building where the victim's body was discovered. Lee testified that Willie Amos, Jr., had moved into one of the apartments at 7347 South Princeton during 1985 and moved out several months later; the building then stood vacant. Lee also testified that he saw either Ralph or Raymond Amos, who were identical twins, at the building around 7:15 on the mornings of both December 9 and December 10. Lee stated further that he did not see the defendant in the neighborhood on either of those days.

At the conclusion of the trial, the jury returned

verdicts finding the defendant guilty of murder, aggravated criminal sexual assault, and aggravated kidnapping. The case then proceeded to a capital sentencing hearing. At the first stage of the hearing, the parties stipulated that the defendant was born in April 1952 and thus was 34 years old at the time of the murder charged here. At the conclusion of the first stage of the hearing, the jury determined the defendant eligible for the death penalty, finding the statutory aggravating circumstances that the victim was killed during the course of aggravated criminal sexual assault and aggravated kidnapping.

At the second stage of the sentencing hearing, the State introduced evidence of the defendant's extensive criminal record. Chicago police officer Johnny Robinson testified that he was driving home on August 22, 1970, when he saw the defendant grab a woman's purse; Robinson got out of his car, fired a shot at the defendant, and eventually captured him.

Beverly Restina Robinson testified to an occurrence involving the defendant on September 23, 1971. Early that morning, as Robinson was leaving her place of employment in River Grove, the defendant forced his way into her car and drove off with her. The defendant demanded money from Robinson, and she gave him some. The defendant choked Robinson and later placed her in the trunk of her car. The defendant then resumed driving. Robinson later was able to escape from the trunk and get help.

Florence Hoffman testified that on August 6, 1975, she returned to her apartment building in Des Plaines around 2 a.m. after playing cards with friends. Upon entering the lobby of her building, she noticed a stranger, whom she identified as the defendant. After Hoffman and the defendant got into the elevator together, the defendant stopped the elevator and placed

a screwdriver against Hoffman's neck. The defendant then ordered Hoffman to return to her car, and together they drove off, with the defendant driving. The defendant forced the victim to perform an act of oral sex on him. Hoffman later jumped out of the car. Philip C. Bettiker, a police officer with the Cook County sheriff's police, testified that he took a statement from the defendant about the offenses. The defendant admitted his responsibility for the crimes, though he said that he released the victim.

Arthur Schmelka testified that on August 1, 1981, he was an assistant manager at a Kentucky Fried Chicken restaurant in Evanston. That day the defendant and an accomplice robbed the restaurant. The defendant was armed, and threatened to kill Schmelka. Schmelka later learned that the defendant had received a 10-year sentence for the offenses.

Evidence of another armed robbery was provided by Martin Carroll. Carroll testified that on July 30, 1981, he went to a Kentucky Fried Chicken restaurant in Chicago and interrupted an armed robbery in progress. The defendant grabbed him and hit him on the back of the head. Carroll later learned that the defendant received a 10-year prison sentence for the offenses.

Rebecca Branum, an assistant warden for the Department of Corrections, testified that on March 27, 1986, she received a report that the defendant was harassing a female food supervisor at the Lincoln Correctional Center. Branum talked to the defendant about it, and he said that the woman appeared to be "easy prey." As a result of this conduct, the defendant was placed in segregation, lost good-time credit, and was transferred to a maximum security institution.

Cameron Forbes, a records office supervisor for the Department of Corrections, provided further testimony regarding the defendant's criminal record and his

conduct while incarcerated. According to Forbes, the defendant first entered the Department of Corrections in May 1973 on a robbery conviction. He was paroled the following year, and then returned to prison in 1976 on convictions for armed robbery and deviate sexual assault. The defendant was released from prison in November 1979. He returned in May 1980 after he had been convicted of theft, and he was released in June 1981. The defendant returned to prison in October 1982, following convictions for armed robbery and other offenses. The defendant was released in July 1986 and was on parole at the time of the offenses committed here. Forbes also stated that the defendant was placed in isolation on several occasions for various infractions of prison rules. Further details concerning the defendant's criminal record were provided by stipulation.

A number of witnesses provided favorable testimony in behalf of the defendant at the second stage of the sentencing hearing. The defendant's mother, Castella Cannon, stated that the defendant was employed in a construction job following his release from prison in 1986. She said that the defendant took part in church and other charitable activities.

Otis Thomas, the president of the Chicago Homeless Union, also testified in the defendant's behalf at the sentencing hearing. Thomas stated that he met the defendant in late 1986. According to Thomas, the defendant was eager to help other homeless persons. Karen Daniel, an attorney with the appellate defender's office, testified that she met the defendant in January 1987. Daniel was a friend of Susan Mitchnick, the defendant's girlfriend at the time. Daniel believed that the defendant could be rehabilitated and stated that the defendant would try to help other persons in the future. Bonnie Buck, a news reporter and editor, also provided favorable testimony. Like Daniel, Buck had met the de-

fendant through her friendship with Susan Mitchnick. Buck believed that the defendant would help others in the future. Dorothy Robinson, a minister, testified that she first met the defendant in November 1987, when the defendant's mother took her to meet the defendant in jail. Robinson stated that she had talked to the defendant perhaps 30 times since then and believed that he would help others.

At the conclusion of the second stage of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The judge accordingly sentenced the defendant to death for the murder of Carolyn Lewis. At a later hearing, the jury determined that the defendant was a habitual criminal and sentenced him to natural life imprisonment for the offenses of aggravated criminal sexual assault and aggravated kidnapping.

## II. Suppression Motion

The defendant raises more than 30 allegations of error in the present appeal. In the discussion that follows, we will generally consider these issues in the sequence in which the alleged errors occurred in the proceedings below. The defendant first argues that the trial judge erred in denying his motion to suppress his confession. The defendant contends that the confession was not preceded by *Miranda* warnings and was the product of physical and psychological coercion.

We will first summarize the evidence presented at the suppression hearing. After the defendant was arrested on October 6, 1987, he was taken to the first district police station. He was picked up there around 3:30 that afternoon by Detectives William Foley and William Kelly from Area 3 violent crimes. Foley gave the defendant *Miranda* warnings but did not question him at that time. The defendant was booked, and the two detectives then transported him to Area 3, where

they arrived around 5 o'clock. The defendant was placed in an interrogation room. Foley and Kelly returned to the room around 6 o'clock and questioned the defendant about the Carolyn Lewis murder for 15 to 20 minutes. Foley, Kelly, and a third detective, Michael Kill, questioned the defendant again around 8 or 8:15. Kill provided the defendant with *Miranda* warnings, and the detectives then talked to the defendant further, telling him what they had learned about the case. The defendant then gave a statement.

Kelly reentered the interrogation room alone around 9:10 or 9:15 and asked the defendant if he needed to use the bathroom. The defendant said that he did not. At some point the defendant requested cigarettes, which Kelly provided to him.

Beginning around 9:15 p.m., the defendant was questioned by Assistant State's Attorney Casimir Bartnik in an interview that lasted about 25 to 30 minutes. Bartnik testified that he began by introducing himself to the defendant and giving the defendant *Miranda* warnings. Bartnik also asked the defendant if he needed to use the restroom or wanted anything to eat or drink; the defendant requested something to eat, so food was obtained for him. The defendant then told Bartnik about the offenses committed here. Afterwards, the defendant declined to repeat his statement in the presence of a court reporter. The defendant did agree, however, to review a written summary prepared by Bartnik and to sign the summary if it was accurate.

After preparing the summary, Bartnik returned to the interrogation room around 10:30 p.m. to review the statement with the defendant. The defendant signed a provision in which he acknowledged that he was waiving his *Miranda* rights. After Bartnik had read aloud one page of the statement, the defendant took the papers from Bartnik and began reading them to himself. Ac-

cording to Bartnik, at several points the defendant seemed to become emotional or upset and shook his head from side to side. Apart from one minor correction, which was made, the defendant did not wish to make any other changes to the statement. The defendant, Bartnik, and Kelly then signed each page.

Assistant State's Attorney Bartnik and Detectives Foley, Kelly, and Kill all denied that anyone kicked, threatened, or physically coerced the defendant, or that the defendant ever requested the assistance of counsel. In addition, Bartnik stated that the defendant did not complain to him of any mistreatment at the hands of the police, and Bartnik did not observe any marks or blood on the defendant. The defendant also told Bartnik that he had not been promised anything in exchange for the statement. Detectives Kelly and Kill specifically denied that anyone threatened to release the name of the defendant's girlfriend to the news media.

The defendant testified in his own behalf at the suppression hearing. The defendant stated that after he arrived at Area 3 he asked to speak to an attorney, but that Foley and Kelly told him to shut up. When the defendant denied knowing anything about the crimes, Kelly hit him on the forehead and tried to kick him in the groin.

Detective Kill later told the defendant that he had talked to the defendant's girlfriend, Susan Mitchnick, and that Mitchnick would lose her job if the defendant did not sign a statement. According to the defendant, Foley, Kelly, and Kill each told him that if he signed a statement confessing to these crimes, Mitchnick's name would not be released to the media.

The defendant said that he finally agreed to sign a statement so that Mitchnick's name would be kept out of the case. The defendant said that he did not actually read the statement before signing it. The defendant also

denied that he ever received *Miranda* warnings in the period following his arrest. The defendant insisted that he would not have signed the statement if the officers had not hit him, interrogated him for so long, or threatened to reveal Mitchnick's name to the press.

On cross-examination, the defendant said that he knew that his name had previously appeared in the newspapers in connection with this case and that the police were looking for him. The defendant said that he did not tell Bartnik about his mistreatment, and he acknowledged telling Bartnik that he was signing the statement voluntarily. The defendant also stated that he did not report the beating when he was examined at the county jail. The defendant maintained that the beating did not leave any visible marks.

The defendant's girlfriend, Susan Mitchnick, also testified in the defendant's behalf at the suppression hearing. She was 30 years old and had known the defendant since December 1986. She stated that during the afternoon of October 6, 1987, she received a phone call from the president of the Homeless Union telling her that the defendant had been arrested. Mitchnick then tried to find where the defendant was being held, and around 4:30 she learned that the defendant was at Area 3. She called Area 3 around 5:15 and asked to speak with the defendant. Mitchnick was told that the defendant was being interrogated and could not receive phone calls. Around 7 p.m., Detective Kill and another officer arrived at her home and questioned her about the defendant and about the December 1986 murder of Carolyn Lewis. Mitchnick told the officers that she did not know anything about the case. In response, Kill told Mitchnick that he could arrange for her name to be run "through the mud" in the media. Mitchnick was then working for a small public relations and political consulting firm, and she believed that her employment

would be jeopardized if that occurred. Mitchnick told the officers once more that she knew nothing about the case. Kill then said that the case could be portrayed as involving "a nice social worker" who befriended a homeless person who happened to be a murderer. The detectives later left. Mitchnick said that a friend, Karen Daniel, subsequently arrived.

On cross-examination, Mitchnick stated that the defendant had never told her that the police were looking for him. She also said that the police did not ask her where she worked, and that she did not volunteer that information.

Karen Daniel, the friend mentioned by Mitchnick, also testified in the defendant's behalf at the suppression hearing. Daniel, an attorney with the State Appellate Defender's office in Chicago, stated that Mitchnick told her that the police had threatened to drag her name through the mud if she did not cooperate.

At the suppression hearing, the parties stipulated that Wayne Kinzie, a medical technician at Cermak Health Services, of the Cook County jail, would testify that he conducted an intake examination of the defendant on October 7, 1987, and observed no bruises, cuts, swellings, sores, or bandages on the defendant at that time. Moreover, the defendant did not complain to Kinzie of any injuries. The parties also stipulated that the defendant had been convicted of armed robbery, unlawful restraint, and aggravated battery in October 1982.

The trial judge denied the defendant's suppression motion. The judge rejected the defense assertions that *Miranda* warnings were never given to the defendant, that the defendant requested counsel, and that police coerced the defendant, either physically or psychologically. Noting that the medical evidence contradicted the defendant's claim that he had been physically mistreated, the judge also said that he disbelieved the

defendant's other testimony regarding coercion. Finally, the judge believed that conduct of the officers toward Mitchnick would be significant only if what was said to her was later communicated to the defendant. The judge found, however, that threats of that nature had not been made to the defendant.

The State must establish the voluntariness of a defendant's confession by a preponderance of the evidence. (*People v. R.D.* (1993), 155 Ill. 2d 122, 134; *People v. King* (1986), 109 Ill. 2d 514, 525; Ill. Rev. Stat. 1987, ch. 38, par. 114—11(d); see *Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627.) Voluntariness will be determined by considering the totality of the circumstances. (*People v. Smith* (1992), 152 Ill. 2d 229, 253; *People v. Melock* (1992), 149 Ill. 2d 423, 447; *People v. Clark* (1986), 114 Ill. 2d 450, 457.) The trial judge's finding will be upheld on review unless it is against the manifest weight of the evidence. *People v. Jones* (1993), 156 Ill. 2d 225, 242-43; *People v. Evans* (1988), 125 Ill. 2d 50, 77; *People v. Kincaid* (1981), 87 Ill. 2d 107, 120.

Applying these precepts to the case at bar, we see no reason to disturb the trial judge's ruling in the present case. The State presented sufficient evidence to demonstrate that the defendant made his statements "freely, voluntarily, and without compulsion or inducement of any sort." (*Clark*, 114 Ill. 2d at 457.) The trial judge will assess the credibility of the witnesses (*People v. Ramey* (1992), 152 Ill. 2d 41, 58), and here the judge found the State's witnesses to be more credible and rejected the defendant's explanations for his statement. Accepting Mitchnick's testimony as true, and her allegation that the officers threatened to release her name to the news media, as she testified, we are not persuaded that the trial judge erred in denying the defendant's suppression motion. The defendant must still show that the police

overcame his will and compelled him to provide the statement he now seeks to suppress. As we have stated, however, the trial judge in the present case found that the defendant's testimony lacked credibility. The conduct complained of was directed at Mitchnick, and represented tactics designed to elicit information from her, not from the defendant. Finally, we do not agree with the defendant that the period of custody was so great that it vitiated the voluntariness of the ensuing statement. The period involved here, about eight hours, was not unreasonably long. See *People v. House* (1990), 141 Ill. 2d 323, 379-81.

### III. Jury Selection

The defendant next raises a series of challenges to the selection of the jury in his case. The defendant first argues that the trial judge erred in failing to dismiss for cause Maria Balderrama, one of the jurors who served on the jury empaneled here. The defendant maintains that Balderrama stated during *voir dire* that she would automatically vote to impose the death penalty if the defendant were found guilty and that the trial judge therefore should have dismissed her for cause. In deciding whether a prospective juror must be removed because of his or her views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.

In support of this contention the defendant quotes the following excerpt from the *voir dire* examination of Balderrama:

"Assistant State's Attorney Meyer: You have strong feelings against the sentencing of someone to death, is that right?

Prospective Juror Balderrama: Yeah, but only until he's proved guilty, because right now I don't know if he's guilty or not guilty, and it's difficult right now to determine.

Mr. Meyer: Let's assume that he was found guilty? Once that is out of the way, do you still have strong feelings against the death penalty?

Balderrama: It's for guilty people.

Mr. Meyer: If he's proved guilty?

Balderrama: Yes."

The defendant argues that the preceding colloquy indicates that Balderrama would automatically vote to impose the death penalty if the defendant were found guilty. Although the defendant's trial counsel did not seek Balderrama's dismissal, the defendant now argues that the juror should have been excused for cause. We do not agree.

As the State observes, Balderrama initially expressed opposition to the death penalty, and the material quoted above shows merely that she would be able to follow the law, and the court's instructions, at the sentencing hearing. At the beginning of *voir dire*, the trial judge asked the venire members whether any of them had religious or moral scruples that would prevent them from imposing the death penalty; Balderrama was one of the venire members who said that she did. When she was examined individually by the trial judge, Balderrama stated that her conscience would not allow her to put anyone to death. The judge then explained that the death penalty was one of the sentences available for the offense of murder and asked the prospective juror whether, if the defendant were found guilty, she would be able to put those feelings aside and consider the death penalty as a punishment and vote to impose it if it was the appropriate sentence. Balderrama stated that she would be able to do so. The assistant State's Attorney then asked Balderrama the questions that appear above.

We agree with the State that the juror in question did not express a disqualifying attitude toward the death penalty or its imposition. She initially stated that her views toward capital punishment would prevent her from voting to impose the death penalty. Once the trial judge had explained the sentencing process more fully, however, the juror indicated that she would be able to consider the sentence. Taken in context, her statements indicate that she believed that only guilty persons were deserving of the sentence, not that all guilty persons should be put to death. Consistent with those views, Balderrama was silent when the trial judge earlier asked which prospective jurors "feel because of the nature of the charge that the only penalty that should be imposed would be the death penalty?" For these reasons, we conclude that juror Balderrama did not express a disqualifying state of mind. Therefore, we have no need to consider here the defendant's further contentions that the trial judge was required to excuse the juror *sua sponte*, and that defense counsel was ineffective for failing to seek Balderrama's removal from the venire.

The defendant next argues that the trial judge erred in failing to conduct a more thorough inquiry of the views of prospective juror Dunham toward the death penalty. The defendant argues that the court's failure to make a more complete examination of the prospective juror required defense counsel to exercise a peremptory challenge when fuller inquiry might have revealed reason to remove the venire member for cause. We note that defense counsel did not object to the judge's questions of the prospective juror or offer any of his own. Conceding that trial counsel failed to properly preserve the issue for review, the defendant argues that the matter is plain error and, alternatively, that trial counsel was ineffective for failing to seek a more complete examination of the prospective juror.

The defendant's argument apparently is that the trial judge erred in failing to specifically ask Dunham whether he would "automatically" vote in favor of imposing the death penalty in this case if the defendant were convicted of murder and found eligible for the death sentence. We have reviewed the *voir dire* of the prospective juror and find that the inquiry was reasonably complete. The judge carefully reviewed with the venire member the three stages of the trial proceedings, from the determination of guilt, through eligibility for the death penalty, and finally the aggravation and mitigation phase. Dunham indicated that he would be able to consider impartially the evidence of guilt and, at the first stage of the sentencing hearing, that he would be able to return a finding against eligibility if there were insufficient evidence of eligibility. With regard to the last stage in the proceedings, the judge stated:

"Q. We come to the third portion of the process in which you would then, assuming first a guilty verdict, and second eligibility, the third process is where you would have to determine the question of whether or not he's going to get it. And you have already indicated you thought you have a preference for that. You would hear evidence, bad things about Mr. Bounds and you would also hear evidence concerning good things about Mr. Bounds.

In making your decision as to whether or not you thought this was the appropriate case for the death penalty or not, would you be able to consider the mitigating factors, or the good things that you hear concerning Mr. Bounds in making that decision? Would you take into consideration those things when you made that decision?

A. I believe so."

Defense counsel did not have any questions of his own to ask the prospective juror, nor did counsel request that Dunham be removed for cause. Trial counsel's inaction suggests that he found the preceding comments sufficient to enable him to determine whether the prospective juror possessed a disqualifying bias in favor of the

death penalty. (See *Morgan v. Illinois* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *People v. Smith* (1992), 152 Ill. 2d 229.) On this record, we are unable to find plain error or ineffective assistance of counsel.

The defendant next argues that the trial judge erred in failing to excuse three additional prospective jurors—Bone, Boyd, and Funk—because of their views toward the death penalty. The defendant contends that all three prospective jurors indicated that they would favor the death penalty and would not be able to impartially determine whether the defendant should receive that sentence.

Although there was no statement immediately after Funk's examination to indicate that he was being removed for cause, the record shows that Funk actually was removed for cause, contrary to the defendant's assumption. During a preliminary examination of prospective jurors' attitudes regarding the death penalty, Funk expressed views that would appear to disqualify him from service. Later, following the preliminary examinations of a number of other prospective jurors, defense counsel listed the names of the persons who were being removed for cause. Without objection from the State, and without correction from the court, counsel included Funk on the list, together with other prospective jurors who were being excused for cause. It thus appears that Funk was in fact removed for cause. Moreover, we note that Funk was not later recalled for examination, and thus defense counsel was not required to exercise a peremptory challenge to remove him from the jury.

To somewhat similar effect was the history of prospective juror Bone. Against this venire member, defense counsel did make a motion for removal for cause. The judge denied the motion, but Bone was never recalled for examination. Thus, even if the judge erred

in failing to remove the venire member for cause, the jury was eventually selected without Bone, and defense counsel was not required to exercise a peremptory challenge against him.

We turn next to prospective juror Boyd. During *voir dire*, defense counsel did not seek to have him removed for cause. Conceding that counsel did not properly preserve the issue for review, the defendant now argues that the failure to remove the venire member was plain error and, alternatively, that defense counsel was ineffective for having failed to seek his removal. We do not agree. While Boyd stated at several points that he "would have problems" with considering mitigating evidence, he later stated that he would probably be able to consider other forms of punishment in deciding whether the defendant should be sentenced to death. Counsel did not seek to have Boyd removed for cause, but counsel did later exercise a peremptory challenge against him. We do not believe that we can now say that counsel was ineffective for failing to seek the venire member's removal for cause. We note that counsel did apparently retain at least one peremptory challenge at the conclusion of jury selection. Assuming that Boyd would have been removed for cause if defense counsel had requested that action, we cannot say that counsel was forced to expend a peremptory challenge that he later would have missed.

The defendant next argues that the trial judge erred in failing to excuse prospective juror Lawrence for cause. Once again, however, the defendant is mistaken in believing that the venire member was not removed for cause. In fact, the trial judge did remove Lawrence from the venire. During *voir dire*, Lawrence expressed the disqualifying view that a person would not be on trial if he was not guilty of the offense. Although at the conclusion of the prospective juror's preliminary exami-

nation no one specifically said that a motion for cause was being made, later, when defense counsel listed the venire members who were being removed for cause, he included Lawrence on the list. Lawrence was never recalled for questioning, and thus defense counsel was never in the position of having to exercise a peremptory challenge against her.

In a final challenge to the selection and composition of the jury, the defendant argues that the trial judge erred in discharging an empaneled juror because of a family medical emergency. Following the selection and swearing in of the jury, but prior to the presentation of evidence, the trial judge learned that one of the jurors, Susan Machman, would not be able to continue serving as a juror because her mother was in the hospital and was terminally ill with cancer. The trial judge informed the parties of this news, and of his decision to excuse the juror from any further service in this case and to replace her with one of the alternates. Defense counsel objected to the judge's actions.

We find no abuse of discretion in the trial judge's handling of the situation. During jury selection Machman, an attorney, informed the court of her mother's condition and of the possibility that her mother might be hospitalized later in the week. Machman stated that she would have difficulty concentrating on the case if her mother were in the hospital. Once the judge learned that Machman's presence would be required at the hospital, the judge had grounds for excusing her from the jury, and he did not abuse his discretion in doing so. (See *People v. Hudson* (1993), 157 Ill. 2d 401, 448.) Alternate jurors are selected so that trials may continue when jurors are unable to continue with their duties, and the medical condition of the juror's mother was cause for the judge to excuse the juror from further service. Contrary to the defendant's argument, he does not

have a right to be tried by a jury comprising persons whom he specifically selected. Rather, the defendant's right is to be tried by an impartial tribunal, "chosen through a joint effort of both parties in compliance with the statutory requirements." (*People v. Ward* (1992), 154 Ill. 2d 272, 305.) The replacement of Machman with an alternate juror did not deny the defendant that right.

## IV. Trial Issues

The defendant raises a number of arguments concerning the guilt phase of the proceedings below, and we now turn to those issues. The defendant first complains of error in the introduction of testimony by Dr. Stein, the chief medical examiner, concerning the possible significance of the partially clothed condition of the victim's body. The victim was found at the crime scene wearing only a pink T-shirt that, the victim's mother testified, did not belong to her daughter. On Dr. Stein's direct examination, the following colloquy occurred:

"Q. Going back to the crime scene, when you observed her, you mentioned she was partially clothed. What, if any, significance do you draw from the fact that she was partially clothed?

A. Well, speaking strictly from my experience, and having visited over a thousand scenes, the partial clothing of an individual, it acts more like an erotic agent than a body in the nude. So it seems not as exciting as a partially clothed body."

The defendant argues that the preceding testimony fell outside Dr. Stein's field of expertise—forensic pathology—and was therefore improper. The defendant concedes that the issue was not properly preserved for purposes of appeal because trial counsel did not object to the testimony or raise the matter in the post-trial motion. (See *People v. Fields* (1990), 135 Ill. 2d 18, 49; *People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.) The defendant contends, however, that Dr. Stein's testimony

amounted to plain error and, alternatively, that he was denied his right to the effective assistance of counsel by his attorney's failure to preserve the issue.

Assuming that the testimony was erroneously admitted, we do not believe that a claim of either plain error or ineffective assistance may succeed here. The plain error doctrine operates as a limited exception to the waiver rule. Supreme Court Rule 615(a) provides that on review, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (134 Ill. 2d R. 615(a).) The doctrine is appropriately invoked when the evidence is closely balanced, or when the alleged error is so fundamental that it denied the defendant a fair proceeding. (*People v. Banks* (1994), 161 Ill. 2d 119, 143; *People v. Childress* (1994), 158 Ill. 2d 275, 300; *People v. Fields* (1990), 135 Ill. 2d 18, 56.) We do not believe that either element has been satisfied here. The evidence of the defendant's guilt was overwhelming. The defendant provided a detailed confession to these brutal crimes, and other evidence established his presence at the crime scene around the time the offenses occurred. Nor do we believe that the alleged error was substantial. The testimony was brief, and the State did not emphasize it. The claimed error was not of such magnitude that it could have deprived the defendant of a fair trial.

We also disagree with the defendant's contention that trial counsel was ineffective for failing to object to this portion of Dr. Stein's testimony. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064, provides a two-part test for evaluating claims of ineffective assistance of counsel. A defendant alleging ineffective assistance must demonstrate that counsel's representation was deficient and that the deficient performance was prejudicial to the defense. To establish prejudice, a defendant "must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

Assuming that the challenged testimony by Dr. Stein was improper and that trial counsel should have registered an objection to it, we do not believe that the defendant was prejudiced as a consequence of the claimed error. As we have stated, the evidence of the defendant's guilt was overwhelming, and we do not believe that there is a reasonable probability that the result of the trial would have been different even if an objection had been made and sustained to the testimony. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Our confidence in the outcome of the defendant's trial has not been undermined here.

The defendant next argues that the State failed to establish the *corpus delicti* of the offenses of aggravated criminal sexual assault and aggravated kidnapping at trial. The defendant contends that the State did not present sufficient evidence independent of the confession to show that either of those two crimes occurred.

This court has described the *corpus delicti* rule in the following terms:

"[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did oc-

cur." (Emphasis in original.) *People v. Willingham* (1982), 89 Ill. 2d 352, 361.

The defendant, in his confession, stated that around 6:30 a.m. on December 9, 1986, he grabbed the victim as she was walking in the vicinity of 74th and Princeton Streets and covered her mouth with his hand. The victim struggled and was able to scream once. The defendant then dragged the victim to a nearby vacant building. The defendant took the victim to the second-floor apartment, where he had been staying, and removed the victim's clothing and threw her down on a bed. The defendant then had vaginal intercourse with the victim, and he might have repeated the act later that day. According to the confession, the defendant later tied the victim's hands and feet with pieces of extension cord. Fearing that the victim would be able to identify him, the defendant killed the victim the next day, strangling her with an extension cord. The defendant said that he attacked the victim, whom he did not know, because she appeared to be an easy target and he was angry with his family for having evicted him from their house.

The evidence independent of the defendant's confession was, we believe, sufficient proof of the *corpus delicti* of the offenses of aggravated criminal sexual assault and aggravated kidnapping. Considering first the charge of aggravated criminal sexual assault, we find that the independent evidence adequately corroborated the details of the defendant's confession and tended to show the occurrence of the offense. This evidence included the testimony of a neighbor who heard a woman scream around the time when the abduction occurred. In addition, the victim was found wearing only a T-shirt, which did not belong to her, and was naked from the waist down. The absence of clothing is consistent with a sexual assault. The victim's possessions were found in the room, including boots, identification, and a ring. This tended

to show that the victim was undressed where her body was discovered. There was also evidence of contusions and abrasions on the victim's body, which corroborated the defendant's statement that the victim resisted the attack. Investigators found a broom handle smeared with what appeared to be feces, and the evidence from the autopsy showed that the victim's anus was dilated; this testimony could provide further evidence of assault. The defendant's reference to his eviction was corroborated by the testimony of the defendant's stepfather, who said that he had asked the defendant to leave the family home. Testimony concerning Carolyn Lewis' small stature mirrored the defendant's statement that the victim seemed to be an easy target.

The defendant observes that there was no physical evidence, such as the presence of semen or trauma to the victim's vaginal area, introduced in this case to show that an act of intercourse occurred. Dr. Stein testified, however, that the absence of trauma to the vaginal and anal areas was not inconsistent with nonconsensual intercourse. Moreover, the victim was found lying unclothed on a mattress in an unheated apartment in Chicago in December. In addition, some of the victim's clothing and belongings were found in the apartment, and there were injuries to her body. While not conclusive proof that an act of penetration occurred, the undressed condition of the body tended to show that the victim was sexually assaulted and corroborated the defendant's description of the attack. The *corpus delicti* of the offense of aggravated criminal sexual assault may be established in the absence of physical evidence of the type suggested by the defendant. (See *People v. Cloutier* (1993), 156 Ill. 2d 483, 503-04.) We believe that the evidence introduced in this case was sufficient.

The defendant also contends that the State failed to introduce sufficient evidence of the *corpus delicti* of ag-

gravated kidnapping. We must reject this argument as well. The evidence here, apart from the defendant's confession, corroborated the details of the defendant's confession and tended to show the commission of this additional offense. In the confession, the defendant stated that he grabbed the victim and dragged her to the abandoned building where he had been living. After sexually assaulting the victim, the defendant tied her hands and feet with an extension cord and left her in that condition while he made a number of trips outside the building. The defendant later strangled the victim because he believed that she would be able to identify him if he did not kill her.

Evidence independent of the defendant's confession corroborated the matters related in the confession and tended to show the occurrence of the offense of aggravated kidnapping. The victim's mother testified that her daughter would regularly leave for work between 6 and 6:30 a.m. and walk to a nearby bus stop. The victim followed that routine on the morning of her disappearance, December 9, 1986, a work day. According to the testimony of a coworker, however, the victim did not arrive for work that morning. Another witness, who lived in the vicinity of where the abduction might have occurred, heard a scream around the time when the victim would have been walking to meet her bus. The victim's body was later found in the building where the defendant had been staying. According to the forensic testimony, the victim had been strangled, and her body bore signs of other injuries as well.

We believe that the preceding evidence adequately corroborated the defendant's confession and tended to show the occurrence of the crime of aggravated kidnapping. This evidence indicated that the victim was abducted while on her way to work and was taken to a nearby building, where she was sexually assaulted and

later murdered. On this record, we find adequate evidence of the *corpus delicti* of aggravated kidnapping.

The defendant makes the further argument that the State failed to prove his guilt for the offense of aggravated kidnapping beyond a reasonable doubt. We do not agree. The standard to be applied in considering the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) In the present case, the defendant's confession, together with the other testimony, established that the defendant abducted the victim and dragged her to a building where he sexually assaulted her. According to the confession, the defendant subsequently tied the victim's hands and feet before he left the victim alone in the house. The defendant killed the victim when he later believed that she would be able to identify him. This evidence was sufficient to establish the defendant's commission of aggravated kidnapping.

The defendant next argues that the trial judge erred when, over defense objections, the judge allowed the State to publish to the jury certain photographs of the murder victim and later allowed a number of those exhibits to accompany the jury when it began its deliberations. The defendant contends that the probative value of the nine photographs at issue was far outweighed by their prejudicial effect. The defendant additionally notes that the victim's identity and cause of death were not disputed at trial.

The State correctly points out that the prosecution is not disabled at trial from proving every element of the charged offense and every relevant fact, even though the defendant fails to contest an issue or is willing to stipulate to a fact. (*People v. Speck* (1968), 41 Ill. 2d 177,

202.) Photographs of a victim, though gruesome, may be admissible if relevant. (*People v. Shum* (1987), 117 Ill. 2d 317, 353-54; *People v. Lindgren* (1980), 79 Ill. 2d 129, 143.) The decision whether to admit photographs into evidence is committed to the discretion of the trial judge, whose determination will be upheld unless it is an abuse of discretion. *People v. Rissley* (1995), 165 Ill. 2d 364, 403; *Shum*, 117 Ill. 2d at 353.

We find no abuse of discretion in this case. Photographs may be admitted to show the nature and extent of the victim's injuries, the condition or location of the body at the crime scene, the manner or cause of death, or details corroborating a defendant's confession, among other uses. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319-20.) The photographs challenged by the defendant provided evidence of the victim's injuries and of the manner and cause of her death. They depicted the injuries to the victim's neck and head as well as those to her extremities. The photographs also corroborated certain details related by the defendant in his confession. In addition, the photographs assisted the jury in understanding the medical examiner's testimony about the autopsy performed in this case. On this record, we find no abuse of discretion in the use of these photographs at trial.

The defendant next contends that the prosecution improperly presented evidence regarding efforts by the police to apprehend him in connection with this case. Specifically, the defendant complains of testimony that a warrant was issued for his arrest shortly after the discovery of the crimes charged here, that he was included on the Chicago police department's "10 most wanted" list, and that his name appeared in the news media. The defendant's trial counsel made no objection to any of the testimony the defendant now challenges, however, and accordingly the issue has not been properly

preserved for review. To surmount the procedural default, the defendant argues that these matters represent plain error or, alternatively, demonstrate that trial counsel was constitutionally ineffective. As we explain below, we find that the challenged testimony was admissible. Accordingly, we do not consider here whether admission of the evidence rose to the level of plain error, or whether counsel was ineffective for failing to object to it.

The defendant first argues that the testimony by prosecution witnesses regarding the arrest warrant could have suggested to the jury that a judge had already determined that the defendant was probably guilty for the offenses charged here. The jury was not informed, however, about the judge's role in issuing the arrest warrant; the jury learned only that a warrant was issued. The defendant's concerns are therefore misplaced. In addition, we note that testimony regarding the issuance of a warrant may be presented when it occurs as part of the narrative of the steps taken in the course of the investigation. (*People v. Hayes* (1990), 139 Ill. 2d 89, 130.) Contrary to the defendant's contention, introduction of such evidence does not violate the rule against hearsay. *People v. Jones* (1992), 153 Ill. 2d 155, 161.

In the present case, testimony regarding the efforts of law enforcement authorities to publicize the offenses and the defendant's alleged role in them was necessary to account for the lengthy delay between the occurrence of the crimes and the defendant's eventual arrest nearly 10 months later. This testimony was also necessary to explain the circumstances under which security guard Robert Easley was able to identify the defendant to the police as a murder suspect. For these reasons, we believe that testimony regarding the issuance of the arrest warrant and the measures taken by the police to publicize the offenses was relevant and admissible.

The defendant argues further that this testimony was an improper attempt by the prosecution to show consciousness of guilt on the defendant's part. We consider that it was admissible on this further ground as well. Contrary to the defendant's argument, we believe there was sufficient evidence to show that the defendant realized that the police were looking for him and that he was thus attempting to avoid arrest. It will be recalled that shortly after the disappearance and murder of Carolyn Lewis, the defendant returned to the vicinity of the crime scene and found police cars in the neighborhood. Shortly after that, he unsuccessfully attempted to enlist the aid of two of his brothers in disposing of the victim's body. One may infer from that evidence that the defendant feared that the police would connect him to the crimes once the body was discovered in the building where he had been living. The defendant's subsequent conduct at the time of his arrest only reinforces that conclusion. The defendant initially gave police an incorrect name and denied that he was Frank Bounds. Later, when Easley approached the car in which the defendant was sitting and greeted the defendant by name, the defendant fled. We believe that this evidence, introduced at trial, was sufficient to support the inference that the defendant was aware of the efforts by police to arrest him, and that his conduct in avoiding arrest reflected consciousness of guilt.

In a related argument, the defendant contends that testimony regarding his failure to surrender to law enforcement authorities was unconstitutionally admitted into evidence. The defendant asserts that prosecutorial comment on his pre-arrest, pre-*Miranda* conduct violated his right against self-incrimination. U.S. Const., amends. V, XIV.

The defendant acknowledges that neither the United States Supreme Court nor this court has previously

resolved this precise issue. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 133.) We have difficulty in discerning how flight can be considered as testimonial and thus within the scope of fifth amendment protections. (See 1 J. Strong, McCormick on Evidence § 124, at 451 (4th ed. 1992).) Still, we do not address the merits of this question here, for the defendant has waived consideration of the issue. The defendant failed to raise this objection to the testimony at trial and did not include the issue in his post-trial motion. Accordingly, we consider the issue waived, as this court did in *People v. Hayes* (1990), 139 Ill. 2d 89, 134, in which a defendant similarly failed to preserve the claim that testimony concerning his failure to surrender to authorities violated his right against compelled self-incrimination.

Assuming that comment of the type challenged here would be a constitutional violation, however, we believe that any error in that regard was harmless beyond a reasonable doubt. (See *Hayes*, 139 Ill. 2d at 134-35.) The prosecutor did not emphasize this portion of the trial testimony, and the evidence of the defendant's guilt was overwhelming. The jury heard the defendant's confession to these crimes, as well as the evidence linking him to the crime scene. On this record, we believe that the error alleged here was harmless beyond a reasonable doubt.

The defendant raises the further contention that evidence regarding the efforts to obtain the warrant for his arrest in this case violated his right under the fourth and fourteenth amendments to the United States Constitution to be free from warrantless, nonconsensual arrests. (U.S. Const., amends. IV, XIV.) Once more, we note that trial counsel did not object to the testimony that the defendant now complains of. In any event, we find no error in this case, and adhere to the holding in *Hayes*, which rejected a similar contention. As in *Hayes*,

"[t]he prosecutor did not invite the jury to infer that the defendant was guilty because the police obtained a warrant for his arrest. Rather, the testimony regarding the warrant was introduced simply to explain the circumstances leading up to the defendant's arrest." (*Hayes*, 139 Ill. 2d at 137.) The prosecution's discussion of the arrest warrant was similar in the present case, and thus we do not agree with the defendant that the State's conduct in this case presented any basis on which to find an assumed fourth amendment violation.

In his next allegation of error, the defendant argues that the State committed a discovery violation by failing to provide defense counsel with a copy of a report prepared by defense witness Moses Cheeks. The question arose during the presentation of the defendant's case in chief, when the prosecutor cross-examined Cheeks, a Chicago housing inspector, about a report Cheeks had prepared on December 15, 1986, following his inspection of the building at 7347 South Princeton, where the present offenses occurred. Defense counsel objected to the State's use of the report on the ground that the prosecution had failed to disclose the report as part of discovery. The defendant renews that argument on appeal, contending that Supreme Court Rule 412(a)(iv) (134 Ill. 2d R. 412(a)(iv)) required the State to disclose the report to the defense. The defendant maintains that the report was especially important because the State used it to impeach Cheeks' testimony that the building was abandoned and uninhabitable. Defense counsel did not identify Cheeks as a witness until four days before trial.

During direct examination, Cheeks testified that the structure on South Princeton was abandoned and uninhabitable. On cross-examination, the prosecutor asked Cheeks whether he had written some violations when he inspected the building. When Cheeks re-

sponded, "No, we don't write violations, sir," the prosecutor asked Cheeks about the report, which, the prosecutor believed, listed four violations. Defense counsel objected to the State's use of the report, complaining that the prosecution had not provided it earlier as part of discovery. The prosecutor acknowledged that the report had not been disclosed to the defense as part of discovery, but said that he had shown a copy of it to the defense attorney earlier that day. The prosecutor further explained that he had believed that certain numbers appearing on the report indicated violations. In response, defense counsel repeated his objection to the State's use of the report and said that he was concerned that the prosecution might have other documents that had not been previously disclosed. The trial judge asked defense counsel whether he wanted more time to review the report at issue, but counsel declined the offer, saying, "I have no problem with this specifically. If there is anything else." The State then resumed its cross-examination of the witness. In response to the prosecutor's questions, Cheeks explained that numbers he had written on the report did not signify violations, as the prosecutor believed, but measures that the building owner would be required to take, such as securing the building and posting a watchman on the premises around the clock.

Assuming that a discovery violation occurred here, we believe that defense counsel waived any objection to the State's use of the report prepared by the defense witness, and that the defendant may not now complain of the State's failure to disclose the document. A brief continuance would have afforded defense counsel the opportunity to consider the evidence more fully, if that was necessary. Defense counsel did not request a continuance, though the trial judge offered to grant counsel time to review the report, and thus the defendant can-

not complain here of the State's failure to disclose the report during discovery. (*People v. Robinson* (1993), 157 Ill. 2d 68, 78-79.) We also note that the report did not appear to contradict Cheeks' testimony that the building was uninhabitable.

In his final challenges to the conduct of the trial, the defendant complains of a number of comments made by the prosecutor during summation and rebuttal argument at the conclusion of the guilt phase of the proceedings. The defendant argues that these remarks were prejudicial and denied him a fair trial.

In closing argument, the prosecutor said:

"And based upon everything that [the police] learned, the warrant was issued.

Let me say something about calling witnesses.

There's probably, in any case, a great deal of, not a great deal, but some witnesses that you wish you had heard from. Both sides have an opportunity to subpoena witnesses. We subpoenaed the witnesses that we felt were appropriate—

[Defense counsel]: Objection, Judge.

THE COURT: Overruled.

[Prosecutor]: As well as the ones we could find.

Detective Kwilos, as I said, testified to different things the police department did in trying to find the defendant. His photograph was distributed throughout the city and was placed on the ten most wanted list. They have leads from every part of the city—south, southeast, west, north side to the city. But whenever they went out there, he was gone."

We do not agree with the defendant that the jury would have understood the preceding comment as shifting the burden of proof to the defense. The prosecutor simply asserted that the State had issued subpoenas to appropriate witnesses. As the State points out, defense counsel in opening statement had urged the jurors "to ask the State where their evidence is at." Defense counsel later invited the jurors to "ask questions, look for things that should be here that aren't here." The

prosecutor's comment regarding the State's witnesses may therefore be construed as a response to defense counsel's own comments. See *People v. Mahaffey* (1989), 128 Ill. 2d 388, 425.

The defendant also complains of comments by the prosecutor stating that the defendant's photograph had been distributed throughout the city and that the defendant had been placed on the police department's "10 most wanted" list, that newspapers had reported that the defendant was wanted for the murder charged here, and that the defendant had tried to elude the police by "dropping out of sight." We find no error in these remarks. The challenged comments did not deny the defendant a fair trial. As we stated earlier, testimony regarding the efforts of law enforcement authorities to arrest the defendant for the crimes charged here was properly admitted. This evidence explained the lengthy delay between the commission of the crimes here and the defendant's eventual arrest, 10 months later, on these charges. In addition, there was evidence from which the jury could infer that the defendant was attempting to evade arrest. Most notably, on the day of the arrest the defendant initially provided police with an incorrect name, and he then attempted to flee when the person who had made the identification greeted him by name. The prosecutor's brief argument on this subject did not depart from the properly admitted evidence. In addition, the remark concerning the failure of the defendant's girlfriend to have noticed any news stories about the crimes was a proper comment on her credibility. Through her employment for a Chicago public relations and political consulting firm, Mitchnick likely would have paid close attention to local news coverage. It was therefore appropriate for the prosecutor to question Mitchnick's assertion that she had no knowledge of the defendant's criminal conduct.

The defendant next contends that the prosecutor erred in telling the jury that if the defendant were not found guilty, "he would walk out that door." The comment challenged here came at the end of a discussion by the prosecutor of the jury instructions. The prosecutor was attempting to remind the jurors that the possibility that the defendant might face the death penalty in this case should not influence them when they decided whether the defendant was guilty of the crimes here. Construing the remark in context (see *People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76), we find no error.

In a final challenge to the conduct of the prosecutors in closing argument at trial, the defendant complains of the following statement made in rebuttal argument:

> "You know how that statement was obtained, and you know why Frank Bounds finally gave it up as it were. That's because the police officers had talked to his family members, including his brothers, Raymond, Ralph, and Willie, and he knew that his brothers had already given him up."

The trial judge overruled defense counsel's objection to the preceding comment.

The State defends the preceding comment on the ground that the remark was made by the prosecution as a response to defense counsel's assertion, in closing argument, that the defendant eventually gave his confession only because of police misconduct. The State correctly observes that testimony that does not reveal the substance of a nontestifying codefendant's statement may be presented to show the steps taken in the investigation or for other reasons, even though the jury could infer from the testimony that a nontestifying third party implicated the defendant, and that such testimony may be argued to the jury in closing argument. (See, *e.g., People v. Gacho* (1988), 122 Ill. 2d 221, 248-49; *People v. Jones* (1992), 234 Ill. App. 3d 1082, 1094; *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 146-47.) In the

present case, however, there was no testimony at trial from any of the defendant's brothers, nor was there testimony from any police officer suggesting that the defendant's brothers had provided assistance to the police.

Although defense counsel objected to the comment, counsel did not later raise the point in the defendant's post-trial motion and thus failed to preserve the issue for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.) Moreover, we cannot conclude that the comment rises to the level of plain error or that counsel's failure to raise the question in the defendant's post-trial motion amounted to ineffective assistance. As we have stated, the evidence in this case was not closely balanced, and we do not believe that the prosecutor's brief misstatement of the evidence could have had any prejudicial effect on the jury's deliberations.

The defendant's reply brief to this court raises one additional challenge, contending that the prosecutor misstated certain evidence in closing argument. Referring to the high level of alcohol found in the victim's bloodstream—a level that the medical examiner could only partly attribute to bodily decomposition—the prosecutor said that the defendant, in his confession, admitted that he had forced the victim to drink alcohol. The defendant contends that the prosecutor's argument was erroneous because the confession did not contain that information. As an appellant, however, the defendant cannot raise an issue for the first time in his reply brief, and therefore we decline to address this additional argument. 155 Ill. 2d R. 341(e)(7) ("Points not argued [in an appellant's initial brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); see *Collins v. Westlake Community Hospital* (1974), 57 Ill. 2d 388, 391-92.

## V. Sentencing Issues

The defendant also raises a number of challenges to the capital sentencing hearing conducted in this case. The defendant first argues that the State was improperly allowed to introduce into evidence, and use before jury, an exhibit that listed the defendant's prior criminal offenses. The exhibit was a printed poster and measured 8 feet by 10 feet. The defendant relies on *People v. Williams* (1994), 161 Ill. 2d 1, in which this court found reversible error in the use of a similar exhibit at a capital sentencing hearing. The trial judge overruled defense counsel's objection to the prosecutor's use of the exhibit. The defendant argues that, under *Williams*, a new sentencing hearing is necessary here because the exhibit was cumulative and prejudicial and unfairly focused the jury's attention on his criminal record.

In *Williams*, this court found reversible error in the State's presentation at the defendant's capital sentencing hearing of a chart listing the defendant's arrests and convictions. The information contained on the chart was wholly cumulative, repeating information already introduced into evidence through the admission of certified copies of the defendant's prior convictions and through the testimony of the witnesses in aggravation. The exhibit in that case was constructed before the jury's eyes, as a placard describing each charge or offense was placed on the chart after each witness testified. Finding that the use of the chart resulted in prejudicial error to the defendant, the court explained:

"In the present case, evidence of defendant's criminal history was presented through certified copies of convictions and through a series of witnesses, all of whose testimony was succinct and clearly understandable. There was no legitimate need for the in-court construction of an eight-foot chart of defendant's criminal background by the taping of placards onto the chart after each witness testified. The placards restated each witness' testimony as

to the date of each offense, the nature of each crime, each case number, the name of each victim, and the sentence, if any, imposed. The chart unfairly memorialized and unduly emphasized the evidence in aggravation." *Williams,* 161 Ill. 2d at 68.

We believe that *Williams* is distinguishable from the present case. Unlike the exhibit at issue in *Williams,* the exhibit used in the present case was not largely cumulative of the testimony presented at the second stage of the sentencing hearing. The exhibit used in this case contained information that was not repeatedly testified to by the State's witnesses in aggravation. Nor was the cumulative nature of the evidence emphasized by the in-court construction of the exhibit, as it was in *Williams.* For these reasons, we do not believe that *Williams* is controlling here.

In the proceedings below, defense counsel's only objection to the display was to its size; counsel did not challenge the accuracy of the information on it. Although the defendant argues that the exhibit erroneously failed to distinguish between felonies and misdemeanors, we agree with the court below that such a distinction was a proper subject for defense counsel to pursue on cross-examination, which he did in several instances. The admission of demonstrative aids is within the trial judge's discretion (see *Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 684-85), and we do not believe that the judge abused his discretion in this case by permitting the prosecution to make use of the exhibit.

In a related contention, the defendant complains that the exhibit failed to distinguish between felony convictions and misdemeanor convictions and that the jury was not properly apprised of the classifications of the past crimes. The defendant asserts that the jury might have believed that all the crimes were felonies. The defendant also states that the prosecutor, in closing

argument, misrepresented the defendant's misdemeanor record. The defendant fails to cite any particular comment that he believes to be objectionable, however, and therefore we will address only the complaint that the exhibit and other evidence did not make the distinction the defendant now urges.

The record shows that the jury was informed of the number of felonies and misdemeanors previously committed by the defendant. The parties stipulated that the defendant's criminal record contained four misdemeanors, and Cameron Forbes, the records supervisor from the Department of Corrections, testified to that effect. Finally, defense counsel reminded the jury of this information in closing argument at the second stage of the sentencing hearing. In his brief before this court, the defendant cites a portion of the *voir dire* examination of Forbes, in which Forbes stated outside the jury's presence that the defendant's record contained at least six felony convictions; the defendant would infer from that statement that his record contained only six felonies. As the stipulation, subsequent testimony, and defense counsel argument make plain, however, the defendant's felony record was more extensive. On this record, there is no reason to suppose that the jurors believed that all the convictions on the list were felonies, as the defendant fears. They had heard testimony and argument indicating that four of the convictions were for misdemeanors.

In a related contention, the defendant challenges the use of convictions for which there did not exist certified copies of conviction. At the sentencing hearing the defendant had no objection to the absence of that documentation, however, or to the State's summary of his criminal record, and in fact stipulated to a portion of the record. Accordingly, the point is waived, and we do not address this question further.

The defendant also contends that the prosecutor made a number of improper comments regarding the exhibit during closing argument at the second stage of the sentencing hearing. The defendant believes that these remarks, which called the jury's attention to the exhibit, simply reinforced the prejudicial effect that had already been produced. Referring in summation to several of the witnesses who had testified regarding the defendant's prior criminal conduct, the prosecutor said, "This chart represents the Frank Bounds that Officer Robinson knows. It represents the Frank Bounds that Miss Robinson, Miss Hoffman, Officer Bettiker, and all of the other witnesses that we call[ed] today know." Defense counsel did not object to that statement. Later, in rebuttal, the prosecutor referred to defense counsel's argument regarding the defendant's employment and charitable activities and then said:

"Busy man, Frank Bounds. Thank God—I hope he did do all that stuff. Could you imagine the size of our chart if he had a little more spare time? We'd have eight more charts in here.

I will agree with one thing. The size of this chart is outrageous. I don't know what's more disgusting—that it tells you what Frank is like, or how the criminal justice system works.

By the way, no one in this courtroom, the judge or the lawyers, had anything to do with these prior cases. But look at this."

Defense counsel did not object to that portion of the argument in rebuttal.

At one point during rebuttal, the prosecutor noted that the exhibit showed only arrest dates for each conviction and that the convictions did not appear to be in strict chronological order. The prosecutor continued, "This get's [sic] pretty complicated. But you can spend a lifetime probably trying to figure that out, if it didn't make you sick." The trial judge overruled defense counsel's objection to the preceding remark.

Arguing that the defendant could not claim any benefit from the mitigating circumstances of no substantial criminal record, the prosecutor later said in rebuttal, "Well, you don't need to be told that if someone has got no prior record, it's something in his behalf. Is that true of Frank? Take a look at the chart." Defense counsel made no objection to this comment. The prosecutor concluded the rebuttal argument with the following: "If you trust the Department of Corrections, go ahead, don't impose the death penalty. Send him back. The chart is eight feet tall. We'll find a bigger one next time." Again, counsel made no objection to that comment.

As we have noted, defense counsel failed to register contemporaneous objections to several of the comments above, and thus counsel failed to properly preserve objections to those remarks. Moreover, although defense counsel did object to other comments, counsel did not renew those objections in the defendant's post-trial motion, and thus those objections must also be considered waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 185-86.) We do not believe that the comments complained of amounted to plain error, nor do we consider that counsel was ineffective for having failed to preserve these matters for review. We have already concluded that the trial judge did not abuse his discretion in allowing the State to use the exhibit at issue here. The prosecutor's remarks generally did not go beyond the bounds of vigorous argument. While several comments were perhaps better left unsaid, we do not believe that the evidence introduced in this case was so close that the comments could have affected the outcome of the sentencing determination or that they operated to deny the defendant a fair sentencing hearing.

The defendant next challenges the introduction at the second stage of the sentencing hearing of certain evaluations made of him while he was previously

incarcerated. This information was introduced through the testimony of Cameron Forbes, a supervisor of inmate records for the Department of Corrections. The first report was made by Louis O'Shea, a correctional psychologist who had interviewed the defendant about a May 1973 robbery, which the defendant acknowledged committing. In his report, O'Shea concluded that the defendant "experienced significant psychosocial difficulties relating to females," and O'Shea expressed the view that the robbery was "an indication of such difficulties." O'Shea went on to add that "more severe types of altercations with females might be a future possibility." The second report now challenged by the defendant was prepared by Edna Davis, a corrections counselor, who asked the defendant about an armed robbery he committed in July 1981. Davis described the defendant as a "criminally disoriented [*sic*], street sophisticated, potentially aggressive individual whose values are highly variant." Although defense counsel objected to the testimony relating O'Shea's findings, counsel failed to object to the testimony relating Davis' findings. Counsel did not raise either point in the post-trial motion filed in this case.

The customary rules of evidence are relaxed at a capital sentencing hearing. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(e); *People v. Steidl* (1991), 142 Ill. 2d 204, 256; *People v. Perez* (1985), 108 Ill. 2d 70, 86.) The touchstones of admissibility at a sentencing hearing are relevance and reliability (*People v. Johnson* (1991), 146 Ill. 2d 109, 152; *People v. Brisbon* (1989), 129 Ill. 2d 200, 218), and testimony that is relevant and reliable may be admitted though it constitutes hearsay (*People v. Foster* (1987), 119 Ill. 2d 69, 98-99). The determination whether evidence is relevant and reliable, and hence admissible, is reserved to the discretion of the trial judge. *People v. Tenner* (1993), 157 Ill. 2d 341, 380-81.

We find no error in the admission of the testimony challenged here. The evidence was clearly relevant, for it concerned the character of the defendant and his potential for rehabilitation. Moreover, the defendant fails to explain in what way the two correctional employees' descriptions of him were unreliable. For these reasons, we find no error in the introduction of this testimony.

The defendant raises the related claim that he was denied a fair sentencing hearing when the State presented unreliable evidence of an incident involving him while in prison. The challenged evidence came in the testimony of Rebecca Branum, an assistant warden. Branum stated that while she was employed at the Lincoln Correctional Center in 1986, she learned that the defendant had been harassing a female food supervisor. Branum spoke with the defendant about the incident, and he admitted that he wanted to slap the woman or throw something at her; the defendant also described the woman as "easy prey." As a result of this conduct, the defendant was placed in a segregation unit, lost good-time credit, and was transferred to a facility with a higher security classification. The defendant now argues that Branum's testimony was unreliable and inadmissible. The defendant concedes that this issue was not preserved for purposes of appeal, and once more he urges us to review the question as one involving plain error or, alternatively, as evidence of counsel's ineffectiveness.

We do not consider the introduction of Branum's testimony to be plain error, nor do we believe that counsel's failure to preserve the issue rose to the level of ineffective assistance. The defendant's argument on this issue is ultimately reducible to the contention that Branum's testimony was unreliable because it was hearsay. As we have already stated, however, and as the

defendant acknowledges in his brief, aggravating evidence is not made inadmissible at a capital sentencing hearing simply because it constitutes hearsay. In the present case, Branum's testimony was relevant to the defendant's rehabilitative potential and his ability to adjust to prison life. (See *People v. Hall* (1986), 114 Ill. 2d 376, 416-17.) Apart from attacking the evidence as hearsay, the defendant has not explained why the witness did not make an accurate assessment of the situation. Indeed, Branum had talked to the defendant about the incident, and the defendant admitted that he wished to harm the woman and described her as "easy prey."

The defendant next argues that a series of comments made by the prosecutor during rebuttal argument at the second stage of the sentencing hearing improperly suggested that the defendant would commit crimes in the future if he were not sentenced to death. Although defense counsel did not object to any of these comments, the defendant contends that the issue is plain error and, alternatively, that counsel was ineffective for failing to make the necessary objections.

The defendant first cites the comment, which we have already discussed, in which the prosecutor contrasted the defense claim that the defendant had taken part in charitable activities with the size of the exhibit displaying the defendant's record of convictions. The defendant also cites a later portion of the rebuttal argument, in which the prosecutor said:

"Frank does like to hurt people. God knows he likes that, and apparently he likes the penitentiary. Why else does he keep coming back?

We can't get rid of Frank. Every time we turn around, here comes Frank again, back to the penitentiary. So, it's obvious Frank could care less about the penitentiary. That's where all his buddies are. It's like going home.

Another thing you know about Frank is Frank is a threat to the whole community. This is not Englewood's

problem, although this particular murder occurred there. Frank has committed crimes all over the county, including the suburbs. Frank is a danger to everybody. To everybody.

You think the penitentiary will stop him? Yeah? Try it. See what happens. Remember Becky [Branum]? Where was Frank on these security. Isn't that something? Minimum security.

You know, one thing that struck me was at first Officer Robinson, who shot Frank during that purse snatching— they talk about the size of this chart. If that officer had been a little better shot, we wouldn't be here."

Finally, the defendant cites once more the following statement by the prosecutor at the conclusion of rebuttal argument:

"Frank is obviously at your mercy at this point. But also the People of the State of Illinois are at your mercy also.

If you trust the Department of Corrections, go ahead, don't impose the death penalty. Send him back. The chart is eight feet tall. We'll find a bigger one next time."

The defendant argues that the preceding comments improperly focused the jury's attention on the speculative possibility that the defendant might commit crimes in the future if not sentenced to death in the present case. The defendant notes that the jury received the *Gacho* instruction (see *People v. Gacho* (1988), 122 Ill. 2d 221), which is given to the jury in cases in which the only alternative to a sentence of death is a sentence of life imprisonment. The defendant argues that the prosecutor's comments suggested, in contradiction to that instruction, that the defendant would be released from prison—and would commit other crimes—if he were not sentenced to death in this case. The defendant also argues that the reference to the Englewood neighborhood injected racist overtones into the case.

As we have noted, defense counsel failed to object to any of the comments being challenged in the present appeal. Accordingly, these contentions must be deemed

waived. Nor do we agree with the defendant that the matter is one of plain error, or that counsel was ineffective for failing to make the necessary objections. We agree with the State that the prosecutor's comments on the defendant's future dangerousness were supported by the evidence. The defendant had an extensive criminal record, having been convicted of committing some 15 offenses prior to the crimes charged here. In addition, there was testimony showing that the defendant had threatened a female correctional employee while previously incarcerated, and that the defendant was aggressive and was a potential threat to women. When supported by the evidence, future dangerousness may be a proper subject of argument. (*People v. Johnson* (1991), 146 Ill. 2d 109, 148-49.) In addition, in cases in which the defendant is not eligible for parole, the State may argue that the defendant would represent a threat to the other prison population. (See *Simmons v. South Carolina* (1994), 512 U.S. 154, 165 n.5, 129 L. Ed. 2d 133, 143 n.5, 114 S. Ct. 2187, 2194 n.5 ("Of course, the fact that a defendant is parole ineligible does not prevent the State from arguing that the defendant poses a future danger. The State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff").) We do not believe that the comment regarding the Englewood neighborhood served to inject racist overtones into the case.

Finally, although we agree with the State that the reference to police officer Robinson and his failure to shoot and kill the defendant was intemperate, we would add that this comment and others made by the prosecution were unprofessional and unnecessary as well. Still, we do not believe that the comments rise to the level of plain error, or that counsel's failure to preserve objec-

tions to them is evidence of ineffective assistance. The comments were fleeting and occurred in a case in which there was overwhelming evidence in aggravation.

In his next allegation of error, the defendant complains of the introduction at the second stage of the sentencing hearing of evidence relating that the defendant had appeared in the Chicago police department's "10 most wanted" list. When this testimony was presented at the second stage of the sentencing hearing, it was elicited by defense counsel. In cross-examining prosecution witness Johnny Robinson, the Chicago police officer who saw the defendant struggling with a woman in 1971, defense counsel asked the witness when he had last seen the defendant. Robinson replied that he had last seen the defendant when the defendant's photograph appeared in the department's "10 most wanted" list. Counsel went on to explain that he meant to ask when the witness had last seen the defendant in person.

The defendant cannot now complain of testimony he elicited from the witness on cross-examination. Notably, the comment was brief, and it simply repeated information that had already been presented at the guilt-innocence phase of the proceedings. At that time, the reference to the defendant's inclusion on the list was used simply to explain what steps had been taken in the investigation of these offenses.

The defendant next argues that improper instructions at the eligibility phase of the sentencing hearing rendered invalid one of the two grounds on which he was found to be eligible for the death penalty. The defendant argues that this deficiency was prejudicial at the second stage of the sentencing hearing because the jury had the invalid determination before it when considering whether to impose the death penalty in this case.

At the first stage of the sentencing hearing, the jury

found the defendant eligible for the death penalty on the grounds that he committed murder in the course of aggravated kidnapping and that he committed murder in the course of aggravated criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6)(c).) The defendant argues, however, that the aggravating circumstance of murder in the course of an aggravated kidnapping was the product of an improper enhancement. The defendant contends that simple kidnapping was enhanced to aggravated kidnapping by the occurrence of the murder, and that he was then found eligible for the death penalty on the basis that the aggravated kidnapping was committed in the course of the same murder.

We note at the outset that the defendant did not raise the present argument in his post-trial motion, and accordingly it is waived. Moreover, we do not find that the alleged impropriety rises to the level of plain error, or that counsel was ineffective in failing to preserve the claim.

It should be noted that the United States Supreme Court affirmed a death sentence even though the only eligibility factor found by the jury—that the defendant knowingly caused a risk of death or great bodily harm to more than one person—was the same as an element of his crime of first degree murder. (*Lowenfield v. Phelps* (1988), 484 U.S. 231, 98 L. Ed. 2d 568, 108 S. Ct. 546.) In the present argument, however, the defendant cites a series of decisions under State law in support of his claim that the alleged double enhancement of his offenses, and his death eligibility, is forbidden. (See *People v. Haron* (1981), 85 Ill. 2d 261; *People v. Conover* (1981), 84 Ill. 2d 400.) He also contends that, under Federal law, the presence of the invalid aggravating circumstance vitiated the jury's decision to impose the death penalty. *Parker v. Dugger* (1991), 498 U.S. 308, 112 L. Ed. 2d 812, 111 S. Ct. 731.

In the present case, the jury returned separate verdict forms finding the defendant eligible for the death penalty on two separate grounds, murder in the course of aggravated kidnapping and murder in the course of aggravated criminal sexual assault. The defendant raises no challenge to the latter finding, and thus there existed an independent, and valid, basis for the eligibility determination. Assuming that the first ground would be an improper double enhancement, we find no basis for disturbing the jury's determination at the second stage of the sentencing hearing that the defendant should be sentenced to death. "The Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravating factors as opposed to a single aggravating factor." (*People v. Page* (1993), 156 Ill. 2d 258, 268-69.) Accordingly, the defendant would remain eligible for the death penalty notwithstanding the invalidity of one of the aggravating circumstances found by the jury.

Moreover, we do not agree with the defendant that the invalidity of an aggravating circumstance undermines the jury's determination that death is an appropriate sanction here. Unlike *People v. Brownell* (1980), 79 Ill. 2d 508, cited by the defendant, the present case does not involve an aggravating circumstance that lacked support in the evidence. The jury here remained free to consider the defendant's conduct in this case, and the acts of violence committed by the defendant against the victim. The invalidity of one of the aggravating circumstances would not subtract from that evidence. We note too that the defendant's conviction for aggravated kidnapping could be supported by acts of violence apart from the murder, and that no improper double enhancement would occur in that case. See *People v. Scott* (1992), 148 Ill. 2d 479, 562.

Finally, even if the jury might have understood that it was to weigh these circumstances in making its sentencing determination, we do not believe that a new hearing is necessary here. (See *Clemons v. Mississippi* (1990), 494 U.S. 738, 752, 108 L. Ed. 2d 725, 741, 110 S. Ct. 1441, 1450.) We conclude that any error here was harmless beyond a reasonable doubt. The State presented overwhelming evidence in aggravation at the sentencing hearing, and the jury considered not only the facts of the brutal crimes committed here, but the defendant's extensive criminal record as well. We do not believe that the absence of this additional aggravating circumstance would have had any effect on the jury's decision to impose the death penalty in this case. And as we explain more fully below, we too believe that death is an appropriate sentence in this case. See *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 376-77.

Finally, the defendant argues that the sentence of death imposed on him for the murder of Carolyn Lewis is excessive and inappropriate. The defendant contends that the evidence he presented in mitigation demonstrated his rehabilitative potential and warranted a sentence other than death. We do not agree.

Analysis of the propriety of the death sentence in a particular case requires an individualized consideration of the circumstances of the offense and of the character and background of the offender. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75; *People v. Strickland* (1992), 154 Ill. 2d 489, 534.) Considering both these elements in this case, we are unable to conclude that the defendant's sentence is excessive or inappropriate.

According to the confession, the defendant abducted the victim early one December morning because he was angry with his family and she seemed to be an easy target. The defendant dragged the victim to a nearby

building and sexually assaulted her. The defendant then held the victim captive for at least a day before murdering her. During that time the defendant tied the victim's hands and feet before he left the premises to buy food and liquor. The defendant later decided to kill the victim because he feared that she would be able to identify him as the abductor and assailant. The defendant wrapped an extension cord around the victim's neck and pulled on the ends of the cord until she ceased to struggle.

The defendant's calculated and cold-blooded brutality leaves no doubt that this is an appropriate case for the death penalty. There is no evidence here to suggest that these offenses were precipitated by some stressful circumstance or mental or emotional disturbance, significant considerations in cases in which death sentences have been found on appeal to be excessive. (See *People v. Tye* (1990), 141 Ill. 2d 1, 30; see also *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 391 ("Of importance here too is that the crime was in no way triggered by any independent provocation").) In addition, by the time the defendant committed the offenses involved here, he had already compiled an extensive criminal record, including convictions for armed robbery, armed violence, and deviate sexual assault.

We do not believe that the evidence of the defendant's charitable activities or the favorable comments made by mitigating witnesses at the sentencing hearing are sufficient to overcome the seriousness of the crimes involved here or the defendant's lengthy record of criminal conduct. Notably, the witnesses were not familiar with the full extent of the defendant's criminal record at the time of their testimony, much less when they formed their favorable impressions of him. There is no contention here that the jury failed to consider the defendant's evidence in mitigation. Given the nature of the offenses committed in this case and the defendant's

extensive criminal history, we must sustain the jury's determination that there were no mitigating circumstances sufficient to preclude a sentence of death.

## VI. Death Penalty Statute

The defendant next raises a number of challenges to the constitutionality of the death penalty statute. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) As we explain below, this court has already rejected the same arguments in other cases, and we see no reason to reach a different result here.

Our cases have held that the statute is not invalid for the discretion it affords the prosecutor in deciding whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43; see also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 993-94.) We have also held that the statute does not place on the defendant the risk of nonpersuasion at the sentencing hearing (*People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49). The defendant was not denied a fair sentencing hearing when the prosecution was permitted to present rebuttal argument at the second stage of the hearing. (*People v. Page* (1993), 155 Ill. 2d 232, 282-83; *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03.) Nor is the statute unconstitutionally vague for permitting the jury to consider "any evidence" why a defendant should be sentenced to death. (*People v. Young* (1989), 128 Ill. 2d 1, 59; *Orange*, 121 Ill. 2d at 390-91; *People v. Perez* (1985), 108 Ill. 2d 70, 97-98.) This court has previously held that the death penalty statute provides sufficient information gathering procedures to insure adequate appellate review of death sentences. (*People v. Albanese* (1984), 104 Ill. 2d 504, 541-42.) Moreover, comparative proportionality review is not required by

the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and our State statute does not mandate such review (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04).

Finally, the defendant argues that a number of features of the death penalty statute, in combination, create the risk that the sentence will be imposed arbitrarily and capriciously. This court has rejected similar challenges in the past, however, and we continue to adhere to those holdings. *People v. Mahaffey* (1995), 166 Ill. 2d 1, 33-34; *People v. Tenner* (1993), 157 Ill. 2d 341, 390; *Page*, 155 Ill. 2d at 284-85; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

\* \* \*

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, March 13, 1996, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.