2021 IL App (1st) 190086-U
No. 1-19-0086
Order filed November 1, 2021

FIRST DIVISION

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court Of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 8762 |
| JESSE RODRIGUEZ | ) ) | The Honorable Kerry M. Kennedy |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WALKER delivered the judgment of the court.
Presiding Justice Hyman and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the evidence is closely balanced, the trial court's violation of Illinois Supreme Court Rule 431(b) required reversal.

¶ 2    On March 26, 2013, Defendant Jessie Rodriguez and his girlfriend, Kim DeBartolo, called 911 to report that G.P., DeBartolo's three-year-old foster daughter was choking and in distress. G.P. died shortly thereafter. Rodriguez was indicted for first degree murder and DeBartolo was offered immunity to testify against Rodriguez at trial. Following a jury trial, Rodriguez was

found guilty, and the trial court sentenced him to 45 years in prison. Rodriguez appeals arguing that: 1) the State failed to prove him guilty of first-degree murder beyond a reasonable doubt; 2) the trial court erred when it allowed the State to treat DeBartolo as a hostile witness; 3) the trial court erred when it instructed the jury on the theory of accountability for the murder; 4) the trial court erred when it allowed a jury instruction on other crimes evidence; 5) he was deprived of a fair trial when autopsy photographs were sent to the jury room during deliberation; and 6) he should receive a new trial because the evidence was closely balanced and the trial court violated Illinois Supreme Court Rule 431(b). Ill. S. Ct. R. 431(b) (eff. July 1, 2012). For the following reasons, we reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4        On May 2, 2013, Rodriguez was indicted for first degree murder in connection with the March 26, 2013, death of G.P.

¶ 5        Prior to trial, DeBartolo retained counsel and alerted the trial court that she intended to assert her 5th amendment rights. At trial, DeBartolo testified for the State under a grant of immunity. The State asked the court to treat DeBartolo as a hostile witness, which the court allowed over defense objection.

¶ 6        DeBartolo testified that in 2010 she and her former husband became the legal guardians of 10-month-old G.P., DeBartolo's great niece. DeBartolo retained custody of G.P after she and her former husband separated in August 2012. DeBartolo met Rodriguez via an online dating website in December 2012. By February 2013, Rodriguez who resided in Chicago, was staying at DeBartolo's Oak Forest home four or five nights a week.

¶ 7        On March 22, 2013, G.P. was vomiting and complained of a stomachache. DeBartolo took G.P. to Ingalls Urgent Care where she was treated by Dr. Lara Wiziecki. Dr. Wiziecki testified that G.P. had no fever, appeared "happy" and "alert," and that her exam was normal. Dr. Wiziecki diagnosed G.P. with gastroenteritis, or stomach flu, and prescribed anti-nausea medication. She did not notice any bruising but did not examine G.P. unclothed. Dr. Wiziecki testified that vomiting, lethargy, and mental status changes are signs and symptoms of a head injury but did not believe that G.P. had any symptoms of a head injury. Further, Dr. Wiziecki testified that she would not have released G.P. if she believed G.P. was not "medically safe."

¶ 8        On March 25, G.P. was still not feeling well so DeBartolo brought G.P. to work with her at Bloom High School, where she was the director of food services. DeBartolo did not want to bring G.P. with her to work a second day in a row so she arranged for Rodriguez to watch G.P on Tuesday, March 26.

¶ 9        On March 26, DeBartolo left for work around 6:45 a.m. while G.P. was still asleep. During the day, Kimberly used Skype to make two video-calls with Rodriguez and G.P. DeBartolo did not notice anything unusual regarding G.P. during the calls. DeBartolo left work around 3:15 or 3:30 p.m. She came home and spent time with G.P., who still did not feel well. DeBartolo noticed a bruise on G.P.'s face, and confronted Rodriguez about it, asking, "What the fuck happened to [G.P.'s] face?" Rodriguez responded that he "gave her a kiss," and "squeezed her face like this. You know how I can squeeze – how I have a firm grip." DeBartolo responded, "Hard enough to leave bruises?" DeBartolo had never seen Rodriguez do anything like that before but accepted his explanation.

¶ 10        Around 6:30 p.m., DeBartolo fed G.P. macaroni and cheese, a glass of milk, and a banana. After dinner, DeBartolo read a book to G.P. and the two prayed. According to DeBartolo, Rodriguez was at the kitchen table. She testified that Rodriguez may have gone out for cigarettes later that night but could not recall.

¶ 11        At around 9:00 or 9:30 p.m., DeBartolo put G.P. to bed; she and Rodriguez went to bed around 10:30 p.m. Around 11:30 p.m., Rodriguez woke DeBartolo up as he was heading to G.P.'s room. As DeBartolo followed Rodriguez to G.P.'s bedroom, she heard coughing. Rodriguez told DeBartolo to call 911 but she was too frantic to operate the phone and handed it to Rodriguez. Rodriguez handed G.P. to DeBartolo and called 911. G.P. vomited twice while DeBartolo held her. During the 911 call, DeBartolo handed G.P. back to Rodriguez, who carried her downstairs and attempted CPR.

¶ 12        Oak Forest 911 dispatcher Alma Madrid received Rodriguez's 911 call at 11:22 p.m. Rodriguez reported that G.P. was choking. Madrid transferred the call to the Orland Park Fire Department, which dispatched an ambulance. Later, after receiving a call from Palos Community Hospital relating to Rodriguez's 911 call, Madrid notified the Oak Forest Police Department Watch Commander and dispatched a police officer to the hospital.

¶ 13        Oak Forest Fire Department firefighter/paramedics, Lt. John Janozik and Matthew Wienke, were dispatched to DeBartolo's house at around 11:22 p.m. and arrived a few minutes after receiving the dispatch.

¶ 14        Janozik testified that he saw DeBartolo standing on the front porch and she "seemed very confused; little bit frightened." As Janozik walked inside the house, DeBartolo whispered, "Please save my baby." Once inside, he found G.P. on the kitchen floor with Rodriguez

4

kneeling next to her, talking on a phone, but not performing CPR. Janozik asked Rodriguez to step aside, which he did. Janozik discovered that G.P. had no pulse and was not breathing. Janozik and Wienke then began performing CPR on G.P. Janozik asked what happened and Rodriguez responded that G.P had been given medicine because she "was sick with stomach flu," and that he had heard her choking. After hearing this information, Janozik and Wienke performed back blows on G.P. but found nothing in her airway.

¶ 15     Wienke testified that G.P. had cyanotic bluing around her lips, which indicated a lack of oxygen. There was vomit on her hair and clothes, and the floor. The vomit did not appear to be macaroni and cheese, but liquid bile. As Wienke carried G.P. outside, he noticed bruising on the right side of her jaw. As they were putting G.P. into the ambulance, Rodriguez asked if he "did the right thing." Janozik responded, "yes."

¶ 16     DeBartolo and Rodriguez followed the ambulance to Palos Community Hospital together, where they learned that G.P. had died. DeBartolo again questioned Rodriguez about the bruise on G.P.'s face; this time he said "that [it] could have happened when he was trying to give her CPR or maybe the paramedics did that." While at the hospital, Wienke heard Rodriguez say that the fire department "did not do enough and that it was our fault."

¶ 17     Oak Forest Police Detective Roberto F. Frias arrived at the hospital after G.P. died and interviewed Rodriguez and DeBartolo separately. Rodriguez told Frias that he heard gasping and saw G.P. standing in the crib with vomit on herself. He lifted G.P. out of her crib and tried "to clear the obstruction … by hitting her on the back," then told DeBartolo to call 911 as he attempted CPR. Rodriguez also told Frias that he believed the paramedics took a long time to arrive. Frias requested a crime scene investigator, and DeBartolo consented to a search of her

house. Frias later photographed Rodriguez's clothing and G.P.'s body, having observed bruising on G.P.'s hands and buttocks and "a significant…, larger bruise, on her right cheek."

¶ 18        Officer Peter Watson, a crime scene investigator with the Illinois State Police, was assigned to process the scene at DeBartolo's house. He took photographs and sampled blood-like substances found around G.P.'s crib. Field tests revealed that the substance, which was reddish in color, did not contain human blood and no blood was found at the scene.

¶ 19        On March 27, Dr. Marta Helenowski conducted G.P.'s autopsy, in the presence of Frias. There were 15 areas of external injury on G.P.'s body, including bruises on her face, arms, and buttocks. The bruises on her buttocks were pattern bruises, indicating that the bruises were caused by an object. Most of the bruises were fresh, but some were older. Dr. Helenowski testified that the bruising under G.P.'s chin could possibly have been caused by resuscitation efforts, but the pattern bruising on the right side of G.P.'s face was caused by a strike, not someone squeezing her face.

¶ 20        Dr. Helenowski observed a 1.25-inch subgaleal hemorrhage on the left potion of the scalp that corresponded to bruising on the left side of G.P.'s forehead and was the result of physical trauma or impact. Removing G.P.'s skull cap, Dr. Helenowski found an accumulation of blood—measuring 5.5 by 4 inches and .02 to .04 centimeters in thickness. Dr. Helenowski noted that the "red jelly-like" consistency and "large liquid component" of the blood indicated that it was a "fresh hemorrhage." Dr. Helenowski also found 125 milliliters of blood inside G.P.'s cranium and noted that studies show that as little as 50 milliliters of blood could cause a fatality in an adult.

¶ 21      Dr. Helenowski saw no evidence of swelling in G.P.'s brain, which she explained meant that G.P. did not survive long enough after the head trauma for swelling to occur. She determined that G.P. died within 12 hours after sustaining the head trauma and that the injury could not have been caused by a short fall, such as a fall out of her crib. Dr. Helenowski concluded that G.P.'s cause of death was blunt force trauma due to child abuse and that her manner of death was homicide. She further stated that the injury that caused G.P.'s death likely occurred between the hours of 7:00 a.m. and 8:00 p.m.

¶ 22      During the autopsy, DeBartolo called Frias several times and left messages. After the autopsy, Frias returned DeBartolo's call and arranged to meet with her later that day. Frias then received a call from Rodriguez, who inquired about the autopsy and the results, and reiterated that he had followed the instructions of the 911 dispatcher. Frias told Rodriguez that they would meet later in the day but did not discuss the autopsy findings with him.

¶ 23      At around 7:30 p.m. on March 27, Frias interviewed Rodriguez while his partner, Det. Richard Belcher, interviewed DeBartolo at her house. Rodriguez stated that he spent March 23-25 and "the early part of" March 26 in Chicago. Initially, Rodriguez said that he was supposed to start a job at a Wisconsin water park on March 26 but admitted that he was getting his dates mixed up. After referring to his calendar book, Rodriguez stated that on March 26, he had taken the train from Chicago and arrived in Oak Forest around 2:00 p.m., took a taxicab, and arrived at DeBartolo's house prior to DeBartolo and G.P. Rodriguez recalled that the evening was normal, but G.P. complained of a stomachache. After going to bed, Rodriguez heard G.P. gasping when he got up to use the restroom. He saw her standing in the crib with vomit on herself and her bedding. He woke up DeBartolo and they called 911.

¶ 24    After the interviews concluded, Rodriguez spoke with DeBartolo "to clarify some information on a date or something," and ran out of the house to speak further with the detectives, but they had already left. Rodriguez then called Frias and said that he was mistaken about the dates, and that he had watched G.P. during the day on Tuesday, March 26 because she was sick. Rodriguez also stated that he, G.P., and DeBartolo had two video-calls that day.

¶ 25    On March 28, DeBartolo was taken to Oak Forest Police Department for questioning. Before being interviewed, DeBartolo knew that the detectives had learned Dr. Helenowski's autopsy findings. She also knew that she was a suspect in G.P.'s death. Initially, DeBartolo did not tell the detectives about the bruise she had seen on G.P.'s face on the evening of March 26. Instead, she said that G.P. had, in the past, sustained bruises at daycare and that she had had a love/hate relationship with the other children. When questioned about bruises on G.P.'s buttocks and whether she slapped G.P., DeBartolo admitted that she used her hand to strike G.P. on the buttocks.

¶ 26    At some point in the interview, DeBartolo asked for an attorney. The detectives then told her that they could not talk to her further and housed her in the lock-up area. After going to the lock-up, DeBartolo agreed to speak without an attorney present, and told officers that she had seen a bruise on G.P.'s face the night of her death.

¶ 27    After the State rested, the trial court denied Rodriguez's motion for acquittal.

¶ 28    Rodriguez then testified in his defense. Rodriguez largely corroborated DeBartolo's account of how they met in December 2012 through a dating service. He first met DeBartolo in person at the end of January 2013. In February 2013, they started to see each other more

often, and Rodriguez began going to DeBartolo's house. Rodriguez, a construction laborer, was unemployed during their relationship.

¶ 29    On March 25, 2013, DeBartolo asked Rodriguez to watch G.P. the next day. He had never been alone with her before. That afternoon, Rodriguez took a train to Oak Forest where DeBartolo was to pick him up at the station. Rodriguez then spent the night at DeBartolo's house.

¶ 30    According to Rodriguez, DeBartolo left for work around 7:30 or 8:00 a.m. on March 26, while G.P. was still asleep. G.P. woke up around 8:30 or 9:00 a.m. Rodriguez then gave G.P. toast and jam. After eating, G.P. got herself dressed, then she and Rodriguez colored pictures together. Around noon, he asked G.P., "are you still hungry and she indicated no." They had a video call with DeBartolo in which Rodriguez expressed concern about G.P.'s lack of an appetite. G.P. and DeBartolo saw and spoke to each other during the call. After the call, G.P. played with toys and watched television in the afternoon. Rodriguez returned to his computer in another room. Later, G.P. and DeBartolo saw and spoke to each during a second video call. Except for having no appetite, G.P. seemed fine; she was not crabby or fussy.

¶ 31    DeBartolo arrived home around 3:30 or 4:00 p.m. Rodriguez told DeBartolo that G.P. was "still the same." G.P. and DeBartolo watched a children's show while Rodriguez watched television in another room. Around 5:30 p.m., Rodriguez borrowed DeBartolo's car to return home to Chicago to get his cigarettes. He made the trip rather than buying some at a store because cigarettes are expensive, and he was not working at the time. Due to heavy traffic, the entire trip took three to four hours. When he returned home, DeBartolo was getting ready for bed, and he assumed that G.P. had already gone to bed.

¶ 32     Rodriguez and DeBartolo went to bed around the same time. Sometime later, he heard "choking" and "a gasping noise." Initially, he thought the noises were coming from the dog, but the dog was asleep in its kennel. Rodriguez then went to G.P.'s room, where he saw her grasping the edge of the rail and vomiting what appeared to be cough medicine. Rodriguez woke up DeBartolo, who came to the room. Rodriguez thought G.P. was choking and told DeBartolo to call 911. He then checked G.P.'s mouth to see if there was anything in there and carried her downstairs to the entryway near the kitchen. He then began to do CPR on G.P. but did not observe bruising on her face, chin, or arms.

¶ 33     When the paramedics arrived, Rodriguez was standing over G.P. on one knee and DeBartolo was pacing in the background. Rodriguez got out of the paramedics' way and walked towards the dining area. The paramedics did not ask him questions. When asked what the paramedics did with G.P., Rodriguez said that "[t]hey picked her up and walked out," taking her to the ambulance. Rodriguez denied that he struck or pushed G.P. on the day of her death and claimed that he never shook her. Rodriguez rested his case after testifying.

¶ 34     During the jury instructions conference, the State sought an "other-crimes" evidence instruction, based on Dr. Helenowski's testimony that some of the bruises were older. The State argued that the jury could believe Rodriguez caused those older bruises. The court allowed the instruction over defense objection. The State also asked for, and received over defense objection, accountability instructions, arguing that the jury could believe that Rodriguez and DeBartolo acted together in causing G.P.'s death.

¶ 35    Defense counsel objected to the autopsy photos going with the jury during deliberations. The court ruled that the photos could go to the jury room, reasoning that the jury had already seen them during the doctor's testimony.

¶ 36    During closing arguments, the State argued that Rodriguez was solely responsible for G.P.'s death. The jury deliberated for over six hours. During their deliberations, the jury sent out two questions: "[W]hat is the meaning of a hung jury?", and "[C]an this hung jury be applied to this case?" The court responded by telling the jury to continue deliberating. The jury ultimately returned a guilty verdict for first degree murder. Rodriguez filed a motion to reconsider or for a new trial. On January 9, 2019, the trial court denied Rodriguez's motions and sentenced Rodriguez to 45-years' incarceration.

¶ 37    This timely appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, Rodriguez argues the State failed to prove guilt beyond a reasonable doubt. He also argues the trial court erred when it allowed the State to treat DeBartolo as a hostile witness, instructed the jury on the theory of accountability for murder, and allowed a jury instruction on other crimes evidence. Rodriguez contends he was denied a fair trial when autopsy photographs were sent to the jury during deliberations. He further contends evidence was closely balanced, and the trial court violated Illinois Supreme Court Rule 431(b) when it failed to ask the venire whether it understood and accepted the principles of Rule 431(b).

¶ 40    Rodriguez requests that this court reverse his conviction outright or, alternatively, reverse and remand for a new trial. He argues that the evidence against him for the murder of G.P. was entirely circumstantial. Specifically, there was no eyewitness to the injury that caused G.P.'s

death. At trial, the State's theory was that Rodriguez injured G.P. while DeBartolo was at work. The defense countered that DeBartolo injured G.P. while Rodriguez went out for cigarettes. Rodriguez contends that the sum of the trial evidence failed to produce a reasonable certainty that Rodriguez, and not DeBartolo committed the murder.

¶ 41    "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon prWoof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48. When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, a reviewing court determines whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*; *Jackson v. Virginia*, 443 U.S. 307, 326 (1979). This standard of review applies in all criminal cases whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). Additionally, a reviewing court must consider "all of the evidence, not just the evidence convenient to the State's theory of the case." *Id*. at 117.

¶ 42    "The trier of fact sits in a superior position to assess the credibility of the witnesses, resolve inconsistencies and determine the weight to be given the testimony, as well as construe any reasonable inferences that fairly may be drawn." *People v. Trzeciak*, 2014 IL App (1st) 1000259–B, ¶ 21. Therefore, a reviewing court must not retry the defendant or substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *People v. Cunningham*, 212 Ill.2d 274, 280 (2004); *People v. Cooper*, 194 Ill.2d 419, 431 (2000). Moreover, a reviewing court is not required to "search out

all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." *Wheeler*, 226 Ill. 2d at 117. The findings of the trier of fact are entitled to deference but are not conclusive. *Brown*, 2013 IL 114196, ¶ 48. As such, a criminal conviction will be reversed where the evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id*.

¶ 43      In this case, there was no direct evidence linking Rodriguez to G.P.'s murder, but circumstantial evidence is sufficient to sustain a criminal conviction if the evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). "Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt." *People v. Rush,* 294 Ill. App. 3d 334, 337 (1998).

¶ 44      On Tuesday, March 26, 2013, Rodriguez was alone with G.P. from roughly 7:00 a.m. until 4:00 p.m. when DeBartolo returned home. DeBartolo was with G.P. from the time she returned until she put G.P to bed at around 9:00 p.m. Dr. Helenowski testified that the injury that caused G.P.'s death likely occurred between 7:00 a.m. and 8:00 p.m. Rodriguez argues that because the State did not present direct evidence that the injury occurred while he was alone with G.P. there remains a reasonable doubt of his guilt.

¶ 45      All the above evidence was presented to the jury and Rodriguez's arguments were rejected. We cannot conclude that finding of guilt was so unreasonable that it must be rejected on appeal. Although the case against Rodriguez was based entirely on circumstantial evidence, when viewed as a whole, the evidence presented could lead a reasonable jury to believe that Rodriguez indeed caused the injury that killed G.P. The jury could base this decision on inferences derived from the evidence presented. On review, this court must allow "all

13

reasonable inferences from the record in favor of the prosecution." *Cunningham*, 212 Ill.2d at 280.

¶ 46    DeBartolo testified that when she returned home, she noticed a bruise on G.P.'s cheek that was not there when she left in the morning and questioned Rodriguez about it. According to DeBartolo, Rodriguez admitted to squeezing G.P.'s cheek and explained that the bruise could have been caused by his firm grip. However, at trial, Dr. Helenowski directly refuted his supposed explanation testifying that the pattern bruising on the right side of G.P.'s face was caused by a strike, not someone squeezing her face. This evidence could lead a jury to reasonably infer that Rodriguez not only beat G.P., but also caused her fatal injury while he was alone with her. When viewed in the light most favorable to the State, a rational trier of fact could find Rodriguez guilty beyond a reasonable doubt of first-degree murder.

¶ 47    Next, Rodriguez argues that the trial court erred when it allowed the State to treat DeBartolo as a hostile witness. The trial court's determination as to whether a witness is hostile is reviewed for an abuse of discretion. *People v. Leonard*, 391 Ill.App.3d 926, 934 (2009). An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, or unreasonable. *People v. Delvillar*, 235 Ill.2d 507, 519 (2009).

¶ 48    Supreme Court Rule 238 provides:

"(a) The credibility of a witness may be attacked by any party, including the party calling the witness.

(b) If the court determines that a witness is hostile or unwilling, the witness may be examined by the party calling the witness as if under cross-examination." Ill. S. Ct. R. 238 (amended eff. April 11, 2001).

14

¶ 49    However, "Rule 238 applies only to witnesses who prove to be hostile, uncooperative, or unwilling while on the witness stand." *Leonard*, 391 Ill.App.3d at 934. Rodriguez contends that the trial court's decision to allow the State to treat DeBartolo as a hostile witness was an abuse of discretion because DeBartolo never demonstrated any hostility or unwillingness to testify while on the stand. The State, relying on *Leonard*, argues that because DeBartolo did not testify voluntarily, but under subpoena, she was a hostile witness.

¶ 50    This case is distinguishable from *Leonard*. In *Leonard*, the State's witness "repeatedly stated that he could not remember the statement he gave the police, that he 'was not sober at the time' and that he had drug problems." *Id*. at 928. Additionally, the witness stated that "he was testifying only because he was subpoenaed and would have preferred not to testify." *Id*. This court held that the trial court did not abuse its discretion when it declared the State's witness hostile because the record established that he was uncooperative, and his lack of recall damaged the State's case. *Id.* at 935.

¶ 51    DeBartolo, like the witness in *Leonard*, was subpoenaed by the State to testify. At trial, DeBartolo acknowledged that prior to accepting service on that subpoena, she indicated to the State that she wanted to consult with a lawyer. Two days before trial, DeBartolo had her attorney inform the State that she would invoke her Fifth Amendment right to remain silent. In response, the State granted her immunity in exchange for her testimony. The State argues that DeBartolo's prior reluctance to testify proved that she was a hostile witness at trial. We disagree.

¶ 52    "It is within the discretion of the trial court to permit leading questions by the party whose witness has unexpectedly told a different story from that which he testified to at a former time."

15

*People v. Johnson*, 82 Ill.App.3d 338, 342 (1980). Here, the trial court permitted leading questions before DeBartolo provided any substantive testimony. She did not invoke her Fifth Amendment right, nor did she unexpectedly change her testimony, and unlike the witness in *Leonard*, she said nothing that could be considered damaging to the State's case prior to being considered hostile. It appears that the State assumed DeBartolo was hostile despite her immunity, but there is no evidence to support that assumption. Under the State's reasoning, any witness granted immunity for testimony could be considered hostile before ever testifying. This is an overly broad interpretation of the rule. As previously stated, "Rule 238 applies only to witnesses who prove to be hostile, uncooperative, or unwilling *while on the witness stand*." *Leonard*, 391 Ill.App.3d at 934 (emphasis added). DeBartolo had not yet proven herself to be hostile while on the stand. Thus, the trial court abused its discretion in allowing the State to preemptively treat her as hostile.

¶ 53 Next, Rodriguez argues the trial court erred when it instructed the jury on the theory of accountability for G.P.'s murder. He contends the State's theory was that he killed G.P. alone and presented no evidence he aided or assisted DeBartolo in the commission of the murder. When considering the trial court's decision to give a jury instruction, this court applies the abuse of discretion standard of review. *People v. McDonald*, 2016 IL 118882, ¶ 42 (2016).

¶ 54 A person may be held accountable if, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5–2(c) (West 2018). Although the submission of an instruction on accountability in the absence of supporting evidence is error, it is proper to instruct the jury on principal action

16

and accountability where the evidence supports both theories. *People v. Batchelor*, 202 Ill.App.3d 316, 331 (1990). Moreover, "only the *slightest* evidence is needed for the trial court to instruct the jury on the theory of accountability." *People v. Zirko*, 2012 IL App (1st) 092158, ¶ 37 (2012) (emphasis in original). "Such evidence, along with evidence that the defendant acted as a principal, is sufficient to support an instruction on each theory, even if the State advanced only one in its case in chief." *People v. Beltran*, 327 Ill.App.3d 685, 692 (2002).

¶ 55    Here, the State's case in chief was that Rodriguez acted alone in murdering G.P. However, G.P was alone with Rodriguez from 7:00 a.m. to 4:00 p.m. and with both DeBartolo and Rodriguez from 4:00 until going to bed at 9:00 p.m. Dr. Helenowski testified that G.P.'s fatal injuries were inflicted between 7:00 a.m. and 8:00 p.m. and there was no evidence to further narrow that window. Hence, it is possible that G.P. was fatally injured between 4:00 p.m. and 8:00 p.m. when both DeBartolo and Rodriguez were present. We acknowledge that there was no direct evidence showing that DeBartolo and Rodriguez planned the murder or aided one another in injuring G.P. However, an accountability instruction may be supported by circumstantial evidence. *Beltran*, 327 Ill.App.3d at 693.

¶ 56    Rodriguez analogizes this case to *People v. Williams*, 161 Ill.2d 1 (1994), but that case is distinguishable. In *Williams*, the defendant was convicted of first degree murder and conspiracy to commit murder. *Id* at 13. At trial, the evidence demonstrated that he shot and killed a woman after being offered money from the mistress of the woman's husband. *Id.* at 18. On appeal, the defendant argued that the trial court erred in giving an instruction on accountability. *Id.* at 50. He maintained that because the State's theory was that he was the one

who shot and killed the victim, the jury had to find that he conspired to kill the victim and was the triggerman, or that he was not guilty. *Id.*

¶ 57    Our supreme court agreed that there was no basis for an accountability instruction. *Id.* at 51. The *Williams* court noted that the totality of the State's evidence against defendant was that he was the actual shooter and "[t]here was no evidence to support the theory that defendant acted as an accomplice to, in addition to acting as a co-conspirator in, the murder." *Id.* Here, G.P. may have been fatally injured when both DeBartolo and Rodriguez were present, thus there was at least the slightest evidence to support the notion that Rodriguez was acting as an accessory. Therefore, the trial court did not err in instructing the jury on the theory of accountability.

¶ 58    Next, Rodriguez argues that the trial court erred when it allowed a jury instruction on other crimes evidence. The court allowed the State's request for the instruction because G.P. had older bruises. However, Rodriguez contends that the State presented no evidence that those bruises were caused by criminal acts, or that Rodriguez committed criminal acts which caused the bruises.

¶ 59    Jury instructions convey the legal rules applicable to the evidence presented at trial. *People v. Mohr*, 228 Ill.2d 53, 65 (2008). "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given. Instructions which are not supported by either the evidence or the law should not be given" *Id.* (internal citations omitted). Before evidence of other crimes committed by a defendant is admitted, the State must first show that "a crime took place and that *the defendant committed it or participated in its commission*."

*People v. Thingvold*, 145 Ill. 2d 441, 455 (1991) (emphasis in original). Proof that a defendant engaged in the uncharged conduct need not be proved beyond a reasonable doubt but must be more than a mere suspicion. *Id*.

¶ 60    Rodriguez acknowledges that he failed to preserve his other crimes instruction claim. "To preserve an alleged error for review, both an objection at trial and a written posttrial motion raising the issue are necessary." *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 10. Although Rodriguez did not include this issue in his motion for a new trial, he seeks relief under the closely balanced evidence prong of the plain error doctrine. "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill.2d 598, 613 (2010). To merit relief under the doctrine's first prong, the defendant must prove that (1) "a clear or obvious error" occurred, and (2) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Jones*, 2016 IL 119391, ¶ 10 (citations omitted).

¶ 61    Here, the trial court's decision to allow an other crimes instruction was error. The State argues that the uncharged conduct evidence satisfied the "mere suspicion" standard. We disagree. Although DeBartolo testified that, on other occasions she noticed bruising on G.P. after having left her alone with Rodriguez and not receiving an explanation, she also testified that G.P. had been bruised before because of normal three-year-old activity and play. DeBartolo also admitted that she had previously used her hands to strike G.P. on the buttocks for punishment. Dr. Helenowski found 15 bruises on G.P., including on her arms and buttocks. However, there was no way to tell whether those bruises were the result of previous child

abuse, normal childhood activity, or DeBartolo's punishment. Moreover, the State offered only mere suspicion that Rodriguez previously abused G.P. or caused any of her bruising.[1] Therefore, the instruction was not supported by the evidence and should not have been given to the jury. *Mohr*, 228 Ill.2d at 65.

¶ 62      The remaining issue is whether the evidence was closely balanced. In determining whether the trial evidence was close, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Our review involves an assessment of the evidence on the elements of the offense charged as well as any evidence regarding witness credibility. *Id.*

¶ 63      On March 25, 2013, G.P. was home all day. Her fatal injuries were inflicted between 7:00 a.m. and 8:00 p.m. and, as previously stated, G.P. may have been injured between 4:00 p.m. and 8:00 p.m. when both DeBartolo and Rodriguez were present. Thus, DeBartolo and Rodriguez were the only possible suspects in the murder. The outcome of this case would necessarily turn on how the jury resolved a credibility contest between the two. Rodriguez was likely found guilty because the jury accepted DeBartolo's version of events over his own. However, DeBartolo provided some questionable testimony.

¶ 64      DeBartolo admitted to spanking G.P. with her hand, but Dr. Helenowski found pattern bruising on G.P.'s buttocks, which meant the bruising was caused by an object or extremely forceful strikes. DeBartolo also testified to changing G.P.'s clothes on the night of her death, but not noticing any bruises on her body besides her face. Dr. Helenowski found 15 bruises on

---

[1] On retrial, the other crimes evidence could be appropriate, but it should be limited to that which is relevant to material issues in the case, with proper instructions that limit the jury's use of that evidence.

G.P. and testified that an individual cannot develop a bruise after being deceased, which meant G.P. had those bruises when DeBartolo put her to bed. Any reasonably observant parent, especially while changing a child's clothes, would notice at least some of these bruises. DeBartolo apparently noticed none. Finally, the most important and damaging evidence against Rodriguez was DeBartolo's testimony that she noticed a bruise on G.P.'s cheek when she returned home. She purportedly questioned Rodriguez immediately upon discovering the bruise and again after learning G.P. had died. However, DeBartolo never told detectives about this bruise until after she was placed in the booking room. Her sudden recall of this crucial fact under these circumstances is troubling. Consequently, we find the evidence in this case closely balanced.

¶ 65    Here, the trial court erred when it allowed a jury instruction on other crimes evidence and the evidence was closely balanced. Therefore, a plain error occurred.

¶ 66    Next, Rodriguez argues that he was deprived of a fair trial when autopsy photographs were sent to the jury room during deliberation. He argues that because he never contested the fact that G.P.'s death was caused by blunt force trauma to her head, "the presence of over 50 autopsy photos in the jury's deliberation room was substantially more prejudicial than probative." The State responds that the autopsy photos were "relevant to the nature and extent of G.P.'s injuries, the manner and cause of her death, and when the fatal blow to her head was delivered." The State also contends that the photos assisted the jury in understanding the medical examiner's testimony on these issues.

¶ 67    The admissibility of evidence begins with the inquiry of whether that evidence is relevant. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). "Generally, evidence must be relevant to be

admitted." *People v. Maldonado*, 402 Ill.App.3d 411, 418 (2008). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Autopsy photographs, even though gruesome, may be admissible if they are relevant. *People v. Bounds*, 171 Ill. 2d 1, 46-47 (1995). However, even relevant autopsy photographs will not be admissible when their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Among the "valid reasons" for admitting autopsy photographs are "to prove the nature and extent of the injuries, the position, condition, and location of the body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." *People v. Chapman*, 194 Ill. 2d 186, 220 (2000). The decision to allow the jury to view autopsy photographs is within the sound discretion of the trial court, whose decision will not be reversed absent an abuse of that discretion. *People v. Brown*, 172 Ill.2d 1, 40-41 (1996).

¶ 68     We find no abuse of discretion in this case. Rodriguez argues that the photographs were irrelevant because G.P.'s cause of death was not at issue. However, "the State is not disabled from proving every element of the charged offense and every relevant fact, even though the defendant fails to contest an issue or is willing to stipulate to a fact." *Bounds*, 171 Ill. 2d at 46. Thus, the State may offer evidence that tends to prove any fact it needs to prove, such as the cause or manner of death, even if that fact is not disputed. Although the photographs, as described, were graphic, they were relevant to show the location and extent of the injuries, as

well as their character and depth. Dr. Helenowski identified injuries and bruising to 15 areas of G.P.'s body. She referred to the autopsy photos when explaining the nature and extent of those injuries and the cause and manner of G.P.'s death to the jury. These photographs aided the jury in understanding her testimony. Therefore, we conclude that the prejudicial effect of the photographs did not outweigh their probative value and the trial court did not abuse its discretion in allowing the jury to view them during deliberations.

¶ 69     Finally, Rodriguez argues that he should receive a new trial because the evidence was closely balanced, and the trial court violated Illinois Supreme Court Rule 431(b). Rodriguez argues that the trial court failed to ask the venire whether they understood and accepted all the principles of Rule 431(b). In a criminal trial, Rule 431(b) mandates a "specific question and response process" where the court must ask potential jurors whether they "understand and accept" all four principles stated in the rule. *Thompson*, 238 Ill.2d at 607. Those four principles are: (1) the defendant is presumed innocent; (2) the State bears the burden to prove the defendant guilty beyond a reasonable doubt; (3) the defendant is not required to offer any evidence; and (4) the defendant's failure to testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The purpose of Rule 431(b) is to ensure that any potential juror who is prejudiced against these bedrock principles of Illinois criminal law is identified and disqualified from serving on the jury. *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). Compliance with a supreme court rule is reviewed *de novo*. *People v. Suarez*, 224 Ill.2d 37, 41–42 (2007).

¶ 70     During *voir dire*, the trial court asked the venire the following questions:

"Under the law a Defendant is presumed innocent of the charges against him. This presumption remains with the Defendant at every stage of the trial and your

23

deliberations on the verdict. It is not overcome unless and until the jury is convinced beyond a reasonable doubt that the Defendant is guilty. Does anyone disagree with this fundamental principle of law? No hands being raised. The State has the burden of proving the Defendant guilty beyond a reasonable doubt. The State carries this burden throughout this case. Does anyone disagree with this fundamental principle of law?

If so, raise your hand. The Defendant is not required to prove his innocence. The Defendant need not present any evidence at all and rely on the presumption of innocence. Does anyone disagree with this principle of law? If so, raise your hand. No hands are being raised. The Defendant does not have to testify. Would anyone hold the fact that the Defendant did not testify at trial; would they hold that against the Defendant? If so, raise your hand."

¶ 71    Our supreme court has held a trial court violates Rule 431(b) by failing to ask the prospective jurors whether they both understand and accept the four principles set forth in the rule. *People v. Belknap*, 2014 IL 117094, ¶ 46. In this case, the trial court asked whether any of the potential jurors "disagreed" with the first three Rule 431(b) principles and whether they would hold Rodriguez's failure to testify against him. The court did not ask whether the prospective jurors understood or accepted any of the principles. "While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror acceptance of the principles, the trial court's failure to ask jurors if they understood the four Rule 431(b) principles is error in and of itself." *People v. Wilmington*, 2013 IL 112938, ¶ 32.

¶ 72        Later, defense counsel attempted to ask the venire if they understood the presumption of innocence. The trial court sustained the State's objection and explained to the venire: "Ladies and gentlemen, there is a presumption of innocence. The presumption of innocence remains with the Defendant throughout this trial and until you find him either guilty or not guilty in the jury room; got it. Everybody understand that?" Although the court eventually asked whether the potential jurors understood the presumption of innocence, it never asked whether they understood the three other Rule 431(b) principles. Therefore, error clearly occurred.

¶ 73        Although defense counsel neither objected to the error, nor raised the issue in a motion for a new trial, Rodriguez argues that this court should review the issue under the closely-balanced-evidence prong of the plain error doctrine. The State argues that Rodriguez forfeited the error and that this court should not review the matter because the evidence was not closely balanced.

¶ 74        To merit relief under the doctrine's first prong, the defendant must prove that (1) "a clear or obvious error" occurred, and (2) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Jones*, 2016 IL 119391, ¶ 10 (citations omitted). Here, the State concedes that the trial court erred in violating Rule 431(b) and as stated above, we find that the evidence was closely balanced.

¶ 75        Because the evidence was closely balanced, the trial court's failure to ascertain whether all jurors understood and accepted the four Rule 431(b) principles alone may have tipped the scales in favor of the State. *Sebby,* 2017 IL 119445, ¶ 78. Whether jurors understand and accept every one of the Rule 431(b) principles "goes to the heart of a particular bias or prejudice which would deprive a defendant of his right to a fair and impartial jury." *Zehr*, 103 Ill.2d at

477-78. Although a violation of a supreme court rule does not mandate reversal in every case (*People v. Glasper,* 234 Ill.2d 173, 193 (2008)), a clear Rule 431(b) violation is a reversible error under the first prong (*Sebby*, 2017 IL 119445, ¶ 78). Here, the trial court failed to confirm that all jurors understood and accepted all four principles of Rule 431(b), and the evidence was closely balanced. Therefore, a plain error occurred.

¶ 76    In sum, the trial court abused its discretion in allowing the State to preemptively treat DeBartolo as a hostile witness and in allowing a jury instruction on other crimes evidence. The court also erred in violating Rule 431(b). Accordingly, we reverse Rodriguez's conviction and remand for a new trial.

¶ 77                                III. CONCLUSION

¶ 78    For the foregoing reasons, the judgment of the trial court is reversed and remanded.

¶ 79    Reversed and remanded